CLIFFORD W. L. CALLWOOD, Plaintiff

v.

**VIRGIN ISLANDS NATIONAL BANK, et al., Defendants**

District Court of the Virgin Islands

Civ. No. 217—1951

Div. of St. Thomas and St. John
at Charlotte Amalie

Feb. 15, 1954

*See, also, 121 F. Supp. 379. Same case on appeal, see p. 540, this volume.*

EUSTACE V. DENCH, St. Thomas, Virgin Islands, *for plaintiff*

MAAS AND BAILEY (DAVID E. MAAS, St. Thomas, Virgin Islands, of counsel) *for defendant Virgin Islands National Bank*

DUDLEY, HOFFMAN and McGOWAN (GEORGE H. T. DUDLEY, St. Thomas, Virgin Islands, of counsel) *for defendant Else Callwood*

HARRY DREIS, St. Thomas, Virgin Islands, *for defendants Iza Callwood and Estate of Peiffer*

JOHN L. PHILLIPS, St. Thomas, Virgin Islands, *for defendant Osmond Kean*

MOORE, *Judge*

This action in replevin was filed by Clifford W. L. Callwood in June, 1951, against the Virgin Islands National Bank and Osmond Kean to compel payment to him of a fund of $7,706.12 held by the bank in Anna R. Peiffer's name with Osmond Kean as trustee. There being three other claimants to the said fund, the bank counterclaimed for interpleader of these additional claimants, Else E. Callwood, Iza Callwood and August Betz, as parties defendant.

This matter first came on for hearing on June 1, 1953, with subsequent hearings held on October 28 and December 1, 1953. Plaintiff, Clifford W. L. Callwood, was represented by Eustace V. Dench, Esquire; the defendant Virgin Islands National Bank by Attorneys Maas and Bailey, David E. Maas, Esquire, of counsel; defendant Osmond Kean by John L. Phillips, Esquire; defendant Else E. Callwood by Attorneys Dudley, Hoffman and McGowan, Geo. H. T. Dudley, Esquire, of counsel; defendant Iza Callwood by Harry Dreis, Esquire; and defendant Estate of Peiffer (August Betz, executor) by Harry Dreis, Esquire.

### Statement of the Facts

The facts in this case are rather lengthy and intricate since the claims to the fund arise out of a long history of involved relationships.

The plaintiff, Clifford W. L. Callwood, is the son of defendant Else E. Callwood. The Callwood family lived in St. Thomas many years ago and the father, Clifford Callwood, acquired considerable property here. Subsequently,

6

Clifford Callwood, Senior, moved with his family to Germany and appointed Osmond Kean as his agent to handle his properties in St. Thomas. At that time many of the properties were in the name of Clifford Callwood, Sr., and his sister, Mrs. Anna R. Peiffer, nee Callwood. However, after his death and pursuant to provisions in the will of Clifford Callwood, Sr., Anna Peiffer in 1924 deeded the properties to Else Callwood, his wife, in exchange for a life interest in the properties formerly owned by herself and her brother. The Callwoods remained in Germany until the outbreak of World War II and Osmond Kean continued to manage the properties in St. Thomas for Anna Peiffer. With the outbreak of the war, Else Callwood and son, Clifford Callwood, neither of whom were German nationals, moved to England and the Peiffers, who were Germans, remained in Wiesbaden, as did also Iza Callwood, a Danish national who was a niece of Anna Peiffer and half-sister of plaintiff, Clifford Callwood.

With the entry of the United States into the war against Germany, it became impossible for funds to be sent to Anna Peiffer in Germany from her properties here, and, therefore, the income from the properties in St. Thomas was deposited in the Virgin Islands National Bank by Osmond Kean in Anna R. Peiffer's name, since she was the owner of the life interest in the properties and entitled to the rents and profits therefrom during her lifetime. The sum in litigation is the sum total of those deposits from rents covering the years from 1941-1947 when Anna Peiffer died.

Now, the plaintiff, Clifford W. L. Callwood, claims the money thus accumulated in the bank on the basis of a written assignment to him by his half-sister, Iza Callwood, whom he claims acted under a power of attorney from her aunt, Anna R. Peiffer. The consideration for

7

same, recited in the written assignment, was said to be plaintiff's undertaking to support his aunt, Anna Peiffer, in accordance with her station in life. Plaintiff admitted on the stand that a probable reason for the assignment, which he asserts was proposed by Iza Callwood, was that no one in Germany could possibly obtain the money in the Virgin Islands, whereas, he, a resident of England, probably could. Plaintiff claims that Iza Callwood had been writing him asking for aid for her aunt and also that he come to Wiesbaden. In 1946 when plaintiff was stationed in Hamburg with the Control Commission of the British Military Government, he claims that he sent Iza Callwood 1000 marks for his aunt. Then, in January, 1947, he went to Wiesbaden where he claims he found that Iza had a document already drawn up assigning to him, under a power of attorney from her aunt issued in 1943, the sums in the Virgin Islands National Bank in Anna Peiffer's name, plus all future rents from the properties in St. Thomas.

Anna Peiffer's husband had been dead since 1942, and she was at this time in a convent where she was being taken care of by the nuns as she was very old and suffering from mental weakness. Clifford Callwood admitted that he knew his aunt was then about 82 years old (actually she was 86 years) and that when he went to see her at the convent she would not speak to him. He denies, however, any knowledge of a communication from the Central Tracing Bureau in 1946 informing him, pursuant to an inquiry by him as to the whereabouts of his aunt, that she was in a Catholic home for old people in Wiesbaden and suffering from mental weakness due to old age. A document addressed to Clifford Callwood, giving this information, was entered in evidence as defendant Else Callwood's exhibit No. 6.

Plaintiff claims in his testimony that while his aunt

did not speak to him about the assignment she had discussed it with her niece Iza, who had had the papers drawn up and the question of its legality determined. The assignment was introduced into evidence as plaintiff's exhibit No. I. Plaintiff claims to have given defendant Iza Callwood 4,000 marks the day before the assignment was executed and another 1,000 marks on January 31, 1947, the day on which the assignment was signed and notarized. This makes a total of 6,000 marks or about $1,500 alleged to have been given by plaintiff to defendant Iza Callwood. This money plaintiff claims was for the use of his aunt, to whom he also sent occasional packages of food stuffs and cigarettes. This is denied by Iza Callwood. There is, however, acknowledgment from Iza Callwood of a few packages and one gift of 1,000 marks to her aunt and another gift of 1,000 marks to her, personally.

Immediately on his return to Hamburg from Wiesbaden, where he had spent 72 hours, plaintiff testified that he had the document translated and then notarized by the American consul in Hamburg. A copy of the assignment was also filed with the court in Wiesbaden. On his return to London in May 1947 he began his efforts to obtain a license from the American authorities for the release of the funds in St. Thomas. He received several letters from the Office of Alien Property informing him that they were investigating the heirship of the "usufruct rights" of Anna Peiffer and whether any enemy nationals had an interest in the fund. It was not until January 12, 1951, that a license was granted to him by the Alien Property Custodian of the United States Department of Justice unblocking the account of Anna R. Peiffer on deposit with the Virgin Islands National Bank. This license was introduced in evidence as plaintiff's exhibit No. II. Plaintiff, however, denied receiving a letter from the Department

of Justice, Office of Alien Property of the same date and along with the license advising him that a German national claimed an interest in the assets and that the license enclosed was good only so far as United States law was concerned and that such property when owned by a person in Germany remained subject to the military government laws of Germany. The letter to this effect dated January 12, 1951, was submitted in evidence by the attorney for the Estate of Peiffer (exhibit No. A).

Prior to receipt of the license aforementioned, Clifford Callwood came to St. Thomas in 1948 and on showing his assignment to Osmond Kean persuaded him to divide the sum in the Peiffer account into two separate accounts; one of $2,500 in his name, i.e., Clifford Callwood, and the other of $5,206.12 in an account in the name of the Else Callwood and Clifford Callwood. Subsequently, Osmond Kean, who was made trustee of both accounts, on learning of the various claims to the Peiffer fund withdrew both of the above-mentioned sums and redeposited the entire $7,706.12 into the old Anna R. Peiffer account. When Clifford Callwood returned to St. Thomas in 1949 he demanded the entire sum of Osmond Kean and the Virgin Islands National Bank, but the bank refused to turn the money over to him or anyone else, declaring its position to be that of a stakeholder until the rightful owner is determined.

Pursuant to an application dated February 2, 1953 (after this case was filed), Clifford Callwood received a foreign exchange license from the Regional Bank of Hesse "for the conclusion of the assignment of January 31, 1947" from Anna R. Peiffer to Clifford Callwood, "excepting possible United States provisions." The admissibility of this license was reserved at the trial.

Defendant Else E. Callwood claims $5,200 of the accumulated rents on the basis of an alleged oral assign-

10

ment to her on August 13, 1939, by her sister-in-law, Anna Peiffer, of all future rents of the properties which originally belonged to her husband, Clifford Callwood, Sr., of which she, Else Callwood, was the succeeding life tenant on the death of Anna Peiffer. Else Callwood relates that on learning of the critical condition of her brother-in-law, Jacob Peiffer, she went to visit the Peiffers in Weisbaden in August, 1939, and that during that visit she mentioned to Anna Peiffer the difficult circumstances she was in since her daughter's death, and her sister-in-law at once said that she should have "from that day forward" (August 13, 1939) all the rents of the properties formerly belonging to her brother (Mrs. Callwood's husband), and that she Anna Peiffer would retain for herself the rent from only those portions of property which she had owned outright, to wit: 1/2 No. 38 Dronningens Gade, 1/3 No. 36 Vester Gade and 1/3 No. 25 Norre Gade.

Else Callwood further testified that Anna Peiffer's husband, Jacob Peiffer, was present during this conversation but he was too ill to speak. On her return to London, defendant Else Callwood notified Osmond Kean, the agent in St. Thomas, of Anna Peiffer's assignment to her and directed him to send the remittances to her. She also tried several times to get written acknowledgment of the assignment from Anna Peiffer but the war intervened, interrupting communications and also the German government placed such severe restrictions and punishments on transfer of any money by German nationals that the Peiffers could not possibly afford to acknowledge the assignment. Else Callwood was never able to obtain the rents from the properties as Osmond Kean refused to remit them to her without the consent of the Peiffers. He wrote Mrs. Else Callwood (exhibit No. 10) that he had received a letter from Mrs. Anna Peiffer dated Sep-

11

tember 13, 1939, in which she confirmed her cablegram saying not to send funds to England and emphasizing that they would be severely punished if they allowed funds to go to England. Upon receipt of this information from Osmond Kean, Else Callwood cabled him that "Peiffers consented personally cannot officially under Law 38."

Next, on December 27, 1939, Else Callwood directed a letter to the British Under-Secretary of State asking the help of that office in obtaining the income from properties in St. Thomas, explaining that she was given the income from certain of the properties by her brother-in-law in Germany, provided the German authorities gave their permission. She was referred to the Trading with the Enemy Branch of the Board of Trade (exhibit No. 7).

Both Mr. and Mrs. Peiffer died in Germany without ever acknowledging, or denying, the alleged oral assignment of rents to Else Callwood. Mr. Peiffer died in 1942 and Mrs. Peiffer died in July, 1947.

Else Callwood asserts that her son, Clifford Callwood, at all times knew of her claim to part of the accumulated rents. Clifford Callwood does admit he knew that his mother claimed she had an assignment of the rents from some time in 1938 but says he never believed it. Else Callwood further states that with knowledge of her claim to the rents, Clifford Callwood went to Germany to see Iza Callwood and that when he returned he told her about his assignment from Iza Callwood on behalf of Anna Peiffer, of all the rentals and accumulated cash. She then told him that $5,200 of it was hers. When Clifford Callwood came to St. Thomas, his mother says she became suspicious of his motives and followed him here, where she found out that he had separated the Peiffer account, putting the amount she claimed in an account in her name and his. She objected to this and instructed

12

Osmond Kean, who was also her attorney in fact, to change the title of the account to her name alone, but instead, Osmond Kean redeposited the two amounts back into the frozen Peiffer account. Else Callwood, thereupon, revoked Kean's power of attorney to act for her, and from 1949 on managed her properties herself.

In the alternative, defendant Else Callwood claims that she, as the succeeding life tenant of these properties, is entitled to a sum of about $5,200 for waste due to the failure of the life tenant of the properties, Anna Peiffer or her agent, to keep them in proper repair as is the duty of every life tenant and, more particularly, as was the duty of Anna Peiffer according to the conditions and stipulations of the will of Clifford Callwood, Sr., under which she, Anna Peiffer, obtained the life interest. Else Callwood alleges that the properties were in a very bad state of disrepair when she took them over from Osmond Kean in 1949, and that they had been so for some time. She presented statements of expenditures by her for the repair of various of the properties and numerous tenants of the properties testified as to their condition, past and present.

Defendant Iza Callwood, niece of Anna Peiffer and sole heir of her estate, contests the validity of the assignment to Clifford Callwood. Iza Callwood, a Danish national, lived with the Peiffers in Wiesbaden, Germany, and still lives there. It appears that she was reared by her aunt, Anna Peiffer, and she claims that she in turn took care of her aunt in her old age and was her only support and confidant after Mr. Peiffer's death in 1942. In 1943 Anna Peiffer gave Iza Callwood a power of attorney which Iza Callwood claims was merely a general authorization to handle all negotiations for her with the German authorities since she could not speak German. It is this authority of Iza Callwood to act for Anna Peiffer which is recited in the alleged assignment.

13

Iza Callwood deposed and testified that in 1946 a commissioner of the United Nations called upon Anna Peiffer at the convent to get information pursuant to an inquiry from the Callwoods regarding Anna Peiffer. Anna Peiffer refused to see the commissioner, but he nevertheless was able to report where she was living and the state of her health. Iza Callwood says that Else Callwood then wrote to Anna Peiffer saying she should cede to her the funds in the bank in St. Thomas because she, Anna Peiffer, would not be able to get them. Iza Callwood says that her aunt instructed her to avoid answering this request; then, the plaintiff, Clifford Callwood, intervened, writing that a lawyer would contact them explaining the necessity of an assignment to prevent the loss of the money. No lawyer ever came to see them, says Iza Callwood, but the plaintiff, Clifford Callwood, continued to send letters urging the assignment. (See exhibits Nos. B and C.)

Iza Callwood says further that Anna Peiffer, at all times, continued to refuse assignment of her frozen funds in St. Thomas to plaintiff. Later in 1946 Anna Peiffer became seriously ill as a result of an apoplectic fit and possibly because of the low rations obtainable in Germany at the time.

Iza Callwood alleges that on or about January 31, 1947, Clifford Callwood came in person to Wiesbaden and demanded that she transfer to him the funds belonging to her aunt on deposit in the Virgin Islands National Bank if her aunt wished to be assured of a good living in accordance with her former station in life. Induced by the promises and threats of plaintiff, Iza Callwood says she entered into the alleged assignment of January 31, 1947, for the benefit of Anna Peiffer. She points out than Anna Peiffer was at that time nearly 87 years old and she, Iza Callwood, was 55 years of age. Iza Callwood further

14

alleged and testified that plaintiff failed to provide for his aunt, Anna Peiffer, in accordance with the agreement and apparently never had any intention of doing so. She claims that only 1,000 marks was ever sent to Anna Peiffer; that this was in 1946, and that she does not know whether it was sent by plaintiff or his mother. Iza Callwood also acknowledges a gift of 1,000 marks to herself from plaintiff on January 31, 1947. She disclaims any gift of 4,000 marks to either herself or Anna Peiffer, and claims that no more than four or five food packages of about 10 pounds each were ever sent by the Callwoods.

August Betz claims the funds for the estate of Anna Peiffer, who died on July 11, 1947. He deposed and testified that he was designated executor of the estate on August 2, 1950, and is still qualified to act as such. He enters the litigation to contest the claims of all others to the funds in the Virgin Islands National Bank under the name of Anna Peiffer, which he contends properly belongs to her estate, no valid assignment ever having been made of these funds with Anna Peiffer's knowledge or consent or under any valid power of attorney for such purposes. He stresses that any such assignments would have been contrary to the laws of Germany as well as contrary to the military government laws of occupied Germany.

## Summary of Claims and Defenses

Plaintiff Clifford W. L. Callwood claims the entire amount on deposit in the Virgin Islands National Bank in Anna Peiffer's name on the basis of his alleged assignment of January 31, 1947, from Iza Callwood, acting under a power of attorney dated 1943 from Anna Peiffer. The plaintiff claims to be in possession of valid licenses from American and German authorities unblocking the accounts to him only.

Plaintiff contends that the oral assignment alleged by de-

fendant Else Callwood is fictitious and at any rate void under the statute of frauds. With respect to the position of Iza Callwood, plaintiff asserts that it was she, Iza Callwood, who instituted the idea of the assignment to him to prevent the loss of the funds, therefore, she cannot now be heard to condemn the agreement which she signed and in which she recited that it was valid under German law. Plaintiff further contends that the claims and defenses of August Betz, executor of the estate of Peiffer, are one and the same with those of Iza Callwood since she is, and admits that she is, the sole heir of Anna Peiffer, and since the same lawyer represents her as an individual and represents the estate of which she is the only heir.

The defendant Virgin Islands National Bank makes no claim to the funds but asks the Court to determine the rightful owner and relieve it of any liability regarding the fund. The defendant bank asks for costs and attorneys' fees.

Defendant Osmond Kean, trustee for the Anna R. Peiffer account, attempted to file an interpleader claiming $500 of the amount on deposit with the Virgin Islands National Bank in Anna R. Peiffer's name as money which does not belong in that account and proved in the prior suit over the Callwood estate to have been deposited by him in mistake. However, copies of the interpleader were not served upon opposing counsel as required by the rules of court and counsel for defendants Else Callwood, Iza Callwood and the estate of Peiffer refused to waive service and notice. Counsel for plaintiff made no objection to Osmond Kean's claim or to waiver of notice. The Court, therefore, dismissed the counterclaim or interpleader of defendant Osmond Kean as to defendants Else Callwood, Iza Callwood and the estate of Peiffer, and stated that if plaintiff were found entitled to the

16

sum in the bank or to any portion of it, defendant Osmond Kean's claim may be asserted out of that portion.

Defendant Else E. Callwood claims $5,200 of the funds in the bank on the basis of an oral assignment to her in 1939 by Anna Peiffer. She pleads that the assignment not being in writing should not bar it since it was due to the force and circumstance of war alone that she was prevented from having written evidence of the assignment. She claims that her son, Clifford Callwood, has acted fraudulently to try to deny her of her just share of these funds and that he at all times knew of her assignment and claim to $5,200.

In the alternative, Else Callwood claims that she is entitled to a sum for waste by the life tenant, Anna Peiffer. She asks the Court to award her a sum sufficient to cover her expenditures for necessary repairs that were long overdue at the time she took over the properties in 1949 as well as at the time of Anna Peiffer's death in 1947.

Defendant Iza Callwood claims she is entitled to the account as the sole heir of Anna R. Peiffer. She claims that the alleged assignment of January 31, 1947, was fraudulently obtained, never fulfilled by plaintiff Clifford Callwood, and was and is contrary to the laws of Germany.

Defendant August Betz claims that the fund properly belongs to the Estate of Peiffer of which he is the lawful executor. He contends that the alleged assignment to Clifford Callwood is invalid on many grounds: (1) it was without the consent of, and contrary to, the wishes of Anna Peiffer; (2) the power of attorney to Iza Callwood did not authorize such a transaction; (3) it is void under the military laws of occupied Germany (Law No. 53); (4) the license from the United States Office of Alien Property was conditional and did not unblock the funds

17

under the circumstances; (5) no valid German license was obtained.

As to the claim of Else Callwood, defendant Betz contends that the alleged oral assignment could be of no effect, being void as against the statute of frauds and the General Code of Civil Law of Germany. He also contends that Else Callwood's claim for waste is untimely, fraudulent and in the wrong forum.

## Discussion of the Claims

Let us now proceed to discuss the various claims to this fund of $7,706.12 which accumulated during the war from rents from the Peiffer-Callwood properties.

## Clifford Callwood

First is the claim of plaintiff, Clifford W. L. Callwood, that the fund in the Virgin Islands National Bank in the name of Anna R. Peiffer was assigned to him in 1947 by Iza Callwood, acting for her aunt, Anna Peiffer. The validity of this assignment has been attacked on several grounds: (1) that it was fraudulently obtained, (2) that the alleged power of attorney under which Iza Callwood acted was not valid or sufficient for the purpose of such an assignment, (3) that the assignment violated German military law in effect at the time and is therefore void, and (4) that the licenses obtained were in pursuance of plaintiff's fraudulent scheme and do not validate the assignment which was void ab initio.

Defendant estate of Peiffer and defendant Iza Callwood contend that plaintiff is guilty of fraudulently scheming from beginning to end to obtain the fund of Anna R. Peiffer in the Virgin Islands National Bank.

The first element which this court has noted and taken into consideration, even before counsel's argument on the point, was plaintiff's demeanor on the witness stand; his belligerent manner and continual arguing with counsel;

18

his constant evasion of direct questions; his hesitation to answer when pressed for a direct answer to the question put instead of answering the one he wished to answer; his frequent failure to recall facts damaging to his case, whereas he remembered vividly other surrounding facts of the same period which were favorable to his claim; his denial of knowledge of many facts and documents subsequently proved by the introduction of exhibits of letters and written instruments bearing his signature or addressed to him.

In the light of this conduct of plaintiff on the witness stand, the Court has analyzed the contentions of plaintiff. In the first place he claims that the assignment to him of the funds of Anna R. Peiffer was entirely at the instance and suggestion of his half-sister, Iza Callwood, but who, he insists, was to receive no benefit therefrom.

The evidence is quite to the contrary. First of all, it appears from exhibit No. 6 (of defendant Else Callwood) that plaintiff himself in 1946 made a formal enquiry as to the whereabouts of his aunt, Anna Peiffer, and that pursuant to the information he thereby received plaintiff began corresponding with Mrs. Peiffer and Iza Callwood. On March 9, 1946, he wrote Iza Callwood as follows:

"Your intention to prevent a transfer of the accumulated sum and the assumption that it will be released one day, will, I am afraid, prove to be a fatal mistake. Kean has already warned that sequestration is imminent. Your objection is going to cause all of us endless trouble and most of all Tantie as I will not be held to ransom for others inability to understand plain, urgent and necessary requests. Do not — on top of all difficulties — write to Kean and ask for explanations he cannot give. Please understand every word of mine in its plain sense, I cannot be more explicit." Estate's exhibit B.

Although plaintiff acknowledges the signature to this letter as his own, he maintained that he did not remember writing it and does not know in what connection it

19

could have been written. (See pages 21-22 of transcript of testimony.) In August of the same year plaintiff again wrote to Iza Callwood in even stronger terms, to wit:

"Undoubtedly you will understand just how serious the situation is and just how urgent it is to procure the necessary documents if a great loss is to be prevented. Please do everything in your power to achieve all that is asked for. I am not a very wealthy man and have to keep two homes. I cannot help unless things are settled in the suggested way. Please take every word as seriously as it is meant.

"The old lady will never be able to draw a single penny. If, on the other hand her nephew were found to be entitled to it, he could act on his own behalf and would thus find himself in a much better position to arrange matters conveniently." Estate's exhibit C.

On the witness stand plaintiff again failed to recall writing this letter and could not explain to what "great loss" he was referring. (See pages 25-26 of transcript.) It might be observed that these letters were written when censorship was still in force and, therefore, the writer could not afford to be more explicit.

From these letters alone it appears clear that it was plaintiff, and not Iza Callwood, who was insisting and, indeed, threatening, that something be done to give him title to the monies in the Virgin Islands National Bank in order to avoid sequestration by the United States Government. But in addition to these letters, we have the testimony of defendant Iza Callwood taken in Germany by way of deposition duly authorized and authenticated. Iza Callwood therein testified that plaintiff wrote many times to her and to her aunt suggesting and warning them that the money should be assigned to him before it was too late for even him to obtain it. He indicated that he alone was in a position to secure the release of the money. Iza Callwood further testified that her aunt was adamantly opposed to such an assignment and at all times

20

refused to make any such assignment to plaintiff. However, defendant Iza Callwood testified that (1) plaintiff was so insistent with his threats and promises and came himself to Wiesbaden to see her, bringing a prepared document with him, and (2) plaintiff's promises to look after the needs of his aunt and even to support her, Iza, and they being in such hungry and needy circumstances these promises constituted a tremendous inducement, she was therefore persuaded to sign the document presented by plaintiff entitling him to the monies in the Virgin Islands National Bank.

On the basis of these facts, it is the opinion of the Court that plaintiff fraudulently obtained the assignment, whether through fraudulently persuading Iza Callwood to make the assignment without her aunt's consent, or with the aid and collusion of Iza Callwood in the belief that some of the funds would be saved for herself.

Plaintiff next insists that the funds assigned to him were for his own personal use and for the benefit of neither his aunt nor Iza Callwood. Yet, the sole consideration for this agreement, says plaintiff, was his promise to support his aunt, in spite of the fact that it was known to him that she was not in need of much if any financial support since she was in a convent being taken care of by the nuns and that the fee for the convent was largely met from her widow's pension. Besides, she was ill, already 86 years old, and could not be expected to live much longer — all of which was known to plaintiff. (Anna Peiffer in fact died in July of that year, just six months later.) The plaintiff maintains, however, that by his agreement he meant to send food packages to supplement the low rations which his aunt received and that he contributed 6,000 marks towards her care and support.

There is no proof that plaintiff contributed a sum of this amount, but it is admitted by Iza Callwood, as men-

tioned above, that plaintiff did make two separate "gifts" of 1,000 marks each, one to his aunt in 1946 and another to her the day the assignment was made. Iza Callwood denies that this latter 1,000 marks was intended for her aunt and also denies any gift or payment of 4,000 marks either to her or to Anna Peiffer. Defendant Iza Callwood asserts that her relationship with Anna Peiffer and the sisters at the convent was such that she would have known of any gifts direct to Mrs. Peiffer. Plaintiff's alleged gift of 250 marks to the convent as a donation is denied by Sister Aegidiana in her deposition taken in Germany.

Defendant Else E. Callwood also claims that her son has attempted to defraud her of her share and interest in the fund.

It is clear from the evidence, in fact it was admitted by plaintiff himself on the stand, that he knew his mother claimed a part of the rents from the properties on the basis of an oral assignment from Anna Peiffer. With this knowledge and the fact that his mother had tried to have her assignment confirmed in writing but had failed, plaintiff went to Wiesbaden, Germany, in 1947 in search of an assignment to himself alone. When he returned to England and told his mother of his success in obtaining the assignment, she reminded him of her claim and stated the amount which she estimated to be hers as $5,200. Plaintiff denies knowledge of the exact amount of her claim, yet when he came to St. Thomas in 1948 he had Osmond Kean separate the moneys in the Peiffer account and place $5,206.12 in an account bearing his mother's name and his own. To the Court this appears as a recognition, at that time, of the amount claimed by his mother. Plaintiff was unable to give any cogent explanation of why he placed this sum in an account together with his mother. He attempted to make many different explana-

tions but the one he finally stuck to was that he did so since his mother had a life interest in the properties and he felt that she was, therefore, entitled to the "interest" from the accrued rentals. He said he did not intend that she should have the principal or the right to withdraw any of the money, but just a right to the interest on the sum. As to why the amount he placed in the account tallied with the amount claimed by his mother, he says it merely happens to have been the balance left after he had taken out $2,500 for himself solely, that being all he needed. (See pages 83-85 of the transcript.) These reasons are not only flimsy but do not even make sense. This court, therefore, cannot but conclude that plaintiff fraudulently attempted to assert his claim over his mother's, and that his two gifts to Iza Callwood of 1,000 marks each (one in 1946 and one in January 1947) were in furtherance of that scheme.

Now, while the Court is of the opinion that plaintiff's fraud bars him from recovery on the assignment, it also wishes to discuss the various claims and denials as to the validity of the assignment to Clifford W. L. Callwood.

█ Plaintiff, denying any fraud on his part, argues that his assignment is a valid contract, pointing out that where a contract is under seal consideration is presumed and the fact that the reward may be extravagant for the consideration given will not affect the validity of the contract, *where there is no fraud*. The Court is in full accord with this principle of law, but it is to be noted that it is applicable only where the Court does not find fraud. In the instant case, this court has already made a finding of fraud and, therefore, the matter of consideration is open to question by the Court.

We have, to some extent, already discussed the question of consideration. We found that in exchange for the assignment of the fund the plaintiff agreed to support

his aunt, Anna Peiffer, in accordance with her station in life. This might have sounded good on paper and been sufficient if never questioned, but since it has been proved that Anna Peiffer was already being taken care of and provided for and had very little longer to live, plaintiff's promise amounted to a nullity. We are then asked to consider the fact that plaintiff contributed some 6,000 marks for the benefit of Anna Peiffer plus occasional food packages. As pointed out above, only 2,000 marks of this amount has been proved and it is highly doubtful whether these sums were given in consideration for the agreement or as inducement to make an assignment, of no benefit to the parties making it.

Plaintiff next urges that the contention of defendants that the assignment is void under German military law is of no effect in this court, since a court will not give effect to foreign law where to do so will prejudice the state's rights or that of its citizens. Besides, says plaintiff, the law of the situs of the land governs the validity of executory contracts relating to real property; and that, anyway, the validity of contracts is generally governed by the place of performance.

█-█ This contention of plaintiff is wholly contrary to the settled law on the question of the validity of contracts. The Supreme Court of the United States has laid down the rules of law governing contracts in cases where the place of making and the place of performance are not the same. Scudder v. Union National Bank, 91 U.S. 406, 23 L. Ed. 245; Pritchard v. Norton, 106 U.S. 124, 1 S. Ct. 102, 27 L. Ed. 104. The following is a summary of the principles therein laid down:

(1) Matters bearing upon the execution, interpretation and validity are determined by the law of the place where the contract is made;

(2) Matters connected with the performance are regulated by

24

the law of the place where the contract by its terms is to be performed;

(3) Matters relating to procedure depend upon the law of the forum.

This court must, therefore, look to the law of Germany to test the validity of the assignment, and it is a generally accepted principle that contracts injurious to, or in violation of, the laws of a foreign state are illegal as contrary to public policy. 17 C.J.S., Contracts, § 269, p. 651.

Defendant Estate of Peiffer has pleaded Military German Law No. 53 as applicable to the transaction and under which it is void. This law was promulgated as early as May 8, 1945, and again on January 21, 1947, by the military authorities in the American zone of occupation, where the parties were living and the assignment was entered into. See Matter of Muller, 1951, 199 Misc. 745, 104 N.Y.S.2d 133. It was therefore applicable to the assignment of January 31, 1947, in Wiesbaden.

The pertinent sections of Military Government Law No. 53 (12 F.R. 7003) is as follows:

"(a) Article 1: *prohibited transactions.*

"(1) Except as duly licensed by or on instructions of Military Government, any transaction involving or with respect to any of the following is prohibited:

"(i) Any foreign exchange assets owned or controlled, directly or indirectly, in whole or in part, by any person in Germany.

\* \* \*

"(4) 'Foreign Exchange Asset' shall be deemed to include:
"(i) Any property located outside Germany.

\* \* \*

"(6) Property shall be deemed to be 'owned' or 'controlled' by any person . . . if such person has a right or obligation to purchase, receive or acquire such property;

\* \* \*

"(3) 'Property' shall mean all movable and immovable property and all rights and interest in or claims to such property

25

whether present or future, and shall include, but shall not be limited to, land and building, money, stocks, shares, patent rights or licenses thereunder, or other evidence of ownership, and bonds, bank balances, claims, obligations and other evidences of indebtedness, and works of art and other cultural materials;

\* \* \*

"(2) 'Transaction' shall mean acquiring, importing, borrowing or receiving with or without consideration; remitting, selling, leasing, transferring, removing, exporting, hypothecating, pledging or otherwise disposing of; paying, repaying, lending, guaranteeing or otherwise dealing in any property mentioned in this section.

\* \* \*

"(a) Article V : *void transactions.*

"Any transfer effected in violation of this section and any agreement or arrangement made, whether before or after effective date of this section, with intent to defeat or evade Law No. 53, or of the objects of Military Government, is null and void."

A mere reading of this law is necessary to show its applicability to the transaction of January 31, 1947. As to whether this court is bound to give effect to this law, we refer to the words of the court in Re Muller's Estate, 104 N.Y.S.2d 133, 137, which involved the applicability of Law No. 53:

"The court is required to give effect to the command of the Military Government. To do otherwise might at some time permit funds to be diverted into the hands of someone not wholly in sympathy with the objectives of the United States.

\* \* \*

"Not only is the court required to give effect to this law by choice, it is also of the opinion that it is compelled to recognize the law as binding on the court as an expression of the dominant policy of the United States."

The Court is, therefore, of the opinion that, apart from the issue of fraud, the assignment of January 31, 1947, is void under the Military Government Law No. 53 of Germany since no license for the transaction was ob-

26

tained by Anna Peiffer or her agent and that this court must give effect to that law.

The plaintiff, however, claims that he is in possession of licenses unblocking the account to him and which take precedence over the provisions of Law No. 53. In 1947, immediately after obtaining the assignment, plaintiff applied for an American license unblocking the funds in the Virgin Islands National Bank. It was not until 1951 that plaintiff received a license from the Alien Property Custodian of the United States department of Justice, unblocking the account to him and at the same time cautioning him that the license was good only in so far as American law was concerned and was not effective where a German national claimed whole or part of the fund. Clifford Callwood, who at first denied ever having received a letter or information from the Department of Justice containing such restriction, presented the bare license to the Virgin Islands National Bank in another attempt to obtain the fund. The bank again refused to turn the money over to him and plaintiff sued.

The Court is of the opinion that this was but another instance of plaintiff's fraudulent acts and purposes, since it was clear that the American license was ineffective where a German national also claimed the fund.

The letter of January 12, 1951, to Mr. Callwood from Mr. Harold I. Baynton, Director of the Office of Alien Property, informed him as follows:

"Information available to this Office indicates that a German national claims to have an interest in the assets which are unblocked under this license. Therefore, you are advised that action by this Office in unblocking such property is effective only insofar as United States law is concerned and such property, when owned by a person in the American, British or French Zones in Germany, remains subject to the Military Government Laws of the respective countries."

27

Plaintiff, then, proceeds, after the suit is filed, to try to obtain a German license. In the meantime, on April 7, 1952, his attorney, on his behalf and at the request of the attorney for the estate of Peiffer, signed a statement of admission in this case to the effect that no German license was necessary and no application had been made for one. Thereafter, plaintiff did procure a German license, through the efforts of his solicitor in Germany, Dr. Dittmar (the same solicitor who prepared and notarized the assignment of 1947). This license plaintiff attempted to introduce in evidence at the trial on October 28, 1953, as proof that the assignment is not contrary to German law and that the German government recognizes his right to the fund, unblocking it to him.

The question of the admissibility of the German license obtained in 1953 was reserved at the trial and must, therefore, now be determined.

■ ■ It is clear that a party having admitted a fact should not be permitted to introduce evidence to contradict the existence of such fact. 64 C.J. 114. It is well settled that "a party having agreed to certain facts by entering into a stipulation cannot, later in the same action, deny such facts, so long as the stipulation remains in force." Lewis v. Lambros, 58 Mont. 555, 194 Pac. 152. It is generally held that a court is bound by such stipulations and that no evidence is admissible to prove or disprove it. See Wigmore on Evidence, secs. 2588, 2590. A judicial admission is held to be conclusive on the party by whom it was made or to whom it is attributable. Wiget v. Becker, 8 Cir., 84 F.2d 706. Therefore, this court is of the opinion that the German license recently obtained by plaintiff is inadmissible in the light of the admission of his counsel by which he is bound.

Counsel for plaintiff argues that it is not clear that the stipulation entered into barred presentation of such a

28

license and that that was not its intent. The admission as made by counsel stated that he:

"1. Denies that plaintiff was advised and put on notice that the License issued by the Alien Property Custodian, was effective only under United States Laws and further denies that the property in question, upon the issuance of the license, was subject to the Military Government in Germany.

"2. Admits that no formal application to the Military Government was made, for the reason that the authority for transferring said property was vested in the Alien Property Custodian to whom formal application was made and by whom official consent was given."

The license received by plaintiff in 1953 provided as follows:

"Based on your application of 2.2.1953 — Ref.: I/H we grant / as an exceptional measure in the name of the Bank of the German Federal States the Foreign Exchange License for conclusion of the assignment dated 31 January 1947 U.R. No. 60/47 of the Notary Public Dr. jur. Erwin Dittmar, Wiesbaden between Frau Anna Peiffer nee Callwood, Wiesbaden-Biebrich and Mr. Clifford W. Callwood, London, excepting possible U. S. provisions."

 Even if this license were admissible, it could not validate a transaction which was void and of no effect at the time it was entered into. Under Law No. 53 transactions entered into without a license were void, not voidable; and, therefore, a subsequent license could not cure this defect and make effective in 1953 a transaction which was void in 1947. In the case of Kent Jewelry Corp. v. Kiefer, Sup., 119 N.Y.S.2d 242, 251, where the court was dealing with the question of the validity of the assignment of patent rights by a German to an American without license to make an assignment, the court held: "Contrary to defendant's contention, any approval of the transfer of the patent rights by the required agencies *after* the institution of the instant action is no defense to plaintiff's claims."

29

Besides, it might be pointed out that under Law No. 53, it was Anna Peiffer who was compelled to obtain a license in order to permit her or her agent to make the assignment to a non-national, and that it was not Clifford Callwood who was obligated to obtain a license to get the funds.

The final question raised with respect to the validity of the assignment has to do with the power of Iza Callwood to make such an assignment on behalf of Anna Peiffer.

The so-called power of attorney given to Iza Callwood in 1943 by Anna Peiffer reads as follows: "To act in all my business, in all concerns, as if I was present myself and to stand good in law, in all my land and other business."

Defendant Iza Callwood testified that this power was given to her for a very specific purpose, to wit: to authorize her to deal and negotiate with the German authorities in all matters concerning Anna Peiffer's property in Germany, since Anna Peiffer was unable to speak any German and after the death of her husband in 1942 needed someone to do business with the German authorities for her.

Defendant estate contends that this was not a general power and it was at no time contemplated that Iza Callwood should convey or otherwise dispose of Anna Peiffer's property in St. Thomas without her consent.

██ ██ Courts generally construe powers of attorney strictly and will not infer broad powers from instruments which do not sufficiently describe the property or subject with which the agent is to deal. 2 C.J. 455, 2 C.J.S., Agency, § 27. In the case of Ashley v. Bird, 1 Mo. 640, 14 Am. Dec. 313, 314, 316, cited by counsel for defendant, the court had before it a power of attorney very similar to the one before us and there the court held

30

that it did not give power to sell land. "A power of attorney 'to act in all my business, in all concerns, as if I was present myself, and to stand good in law, in all my land and other business' gives no power to sell land."

The court said of this language that it was entirely at a loss to know what effect this power of attorney was to have. It gave full power to do something — but what?

That is exactly the opinion of the Court here and, therefore, we must hold that such a power as this was not sufficient for the purpose of assigning away the principal's right to the profits from her real estate in St. Thomas.

In this connection it is to be noted that when Clifford Callwood went to Wiesbaden to get his purported assignment of these funds from Iza Callwood, according to his own testimony, his aunt Anna Peiffer would not speak to him. This was in January, 1947, when she was 86 years old, confined in the convent and mentally impaired. Her refusal, therefore, to speak to him could have been only for one of two reasons: either she was mentally unable to recognize him or she did not approve of him or the purpose for which he came.

In either case, the general language of the previous (1943) agreement with her niece could not be construed as authority for the niece to give to the plaintiff these specific funds in question, belonging to her aunt. This court is further of the opinion that even if it could be successfully argued that this previous general agreement between Iza Callwood and her aunt, Anna Peiffer, did give her the discretion to dispose of her aunt's property in St. Thomas specifically, and was not revoked or impaired by the aunt's condition after she entered the convent, such an act as the assignment herein which plaintiff claims gave him the funds outright as his own, was an abuse

31

of that discretion, amounting to a give-away of money which Iza Callwood was supposed to manage for her aunt and not to dispose of to someone else.

## Else Callwood

Now, with respect to the claim of defendant Else Callwood the Court believes that in all probability Anna Peiffer did make an oral assignment to Else Callwood of the rents from the properties which Mrs. Callwood's husband formerly owned. It seems likely that Anna Peiffer might have done this in view of the circumstances, to wit: their relationship; their comparative financial circumstances at the time; the fact that Else Callwood was living in England and would probably be able to get the money whereas Anna Peiffer would not; the fact that Else Callwood immediately notified Osmond Kean of her assignment (exhibit No. 10); the fact the defendant Iza Callwood never refuted this claim of an oral assignment, but rather seemed to indicate that a kindly feeling existed between the two; the fact that the plaintiff, who was desperately trying to get the money, at first separated the amount claimed by his mother from the general fund and put it in his and her name; and, lastly, the fact that Mrs. Callwood in her demeanor seemed to the Court to be telling the truth on the witness stand.

But the mere establishment of this assignment is not enough. There remains the question of its validity, and two issues have been raised with respect thereto: (1) Is an oral assignment of future rents valid under the statute of frauds? and (2) Was such an assignment by a German national to a non-German permissible under existing German law?

Whether this oral assignment is barred by the statute of frauds depends on whether an assignment of future rents is considered to be in the nature of personalty or an interest in land. If the latter, it follows that it is barred

by the statute since no interest in land may be assigned unless it be in writing. Code (1921) of the Municipality of St. Thomas and St. John, Title II, ch. 9, sec. 1 (28 V.I.C. § 241). Since there has been no presentation of the German law on this matter, we are forced to apply the provision of our code which is based on the old common law provision.

 The authorities uniformly hold that accrued rent is deemed to have the characteristics of personal property, but as to the nature of unaccrued rent there is some diversity of opinion. While some authorities regard as an assignment of rent to accrue as an assignment of a "mere chose in action" which may be orally conferred, the weight of authority is to the contrary. 32 Am. Jur. 348; 2 Williston on Contracts 1413, sec. 491. The majority of courts still follow the common law which regarded rent as "issuing from the land" and that, therefore, an agreement to transfer the right to rent must be in writing. In the case of Schmid v. Baum's Home of Flowers, 162 Tenn. 439, 37 S.W.2d 105, 108, 75 A.L.R. 261, 265, this question was discussed by the court which stated: "Rent accruing to the lessor of real estate . . . is not a debt within the classification of choses in action . . . This right to future rents is not personal property, and, upon the death of the lessor, or owner of the reversion, passes to the heirs at law with the reversion." The court then goes on to say that: "It is, however, universally recognized that rent is severable from the reversion, and that the owner of the reversion may effect this severance by granting or transferring the rent to another."

The question of whether such a transfer had to be in writing was not involved in the case, but the court did have occasion to quote at length from the case of Winnisimmet Trust, Inc. v. Libby, 232 Mass. 491, 122 N.E. 575,

576, which has been cited to us by counsel. There, the court held: "Rent, that is, the right to recover future installments of rent as they become due under the lessee's covenant to pay rent in the future, is not a chose in action, but is an incorporeal interest in land which can be assigned only by an instrument under seal."

It is, therefore, the opinion of this court that an oral assignment of rents is void and consequently the oral assignment to Mrs. Callwood is of no effect.

It has also been argued that the alleged oral assignment was void under the German Devisen Law of December 12, 1938, which made a license required to transfer claims of a German payable in foreign currency against a foreigner. The law further provided that where no license was obtained the transaction was null and void.

It is not necessary for the Court to go into this issue in the light of the holding above, but it may be indicated that the reasoning applicable to the validity of the assignment to Clifford Callwood, based on conflict of laws, is likewise applicable here.

Defendant Else Callwood also makes a claim in the alternative, on the basis of waste by the life tenant.

The cases are numerous and the law well settled that it is the life tenant's duty to make repairs necessary to prevent decay or waste. See Annotations 128 A.L.R. 201, 210, and 33 L.R.A. (n.s.) 667. There is no question that a life tenant is bound to make such repairs as are necessary to preserve the property. Some courts hold that a life tenant is bound to keep the premises in as good repair as they were when the life tenancy began.

The objections that have been made to the claim of waste by opposing counsel have chiefly centered on the lack of proof of waste by the life tenant or her agent. Six tenants of the properties in issue testified. All of them enumerated many complaints about the condition of

the houses and that only a few of these conditions of disrepair were fixed by Mrs. Peiffer's agent for the properties, Osmond Kean. A recurrent complaint was that he painted the outside of the buildings and left bad flooring and leaking roofs unrepaired over a period of years. A summary of the material statements of the six tenants who testified will give a picture of the situation:

Valerie Moorehead, tenant of 16 Hospital Line from 1941 to 1951, testified that leaks were never satisfactorily repaired, only patched so that leaks constantly recurred and that a badly needed kitchen roof was not put on until Mrs. Callwood took over the properties.

Leona Canton, tenant of 11B General Gade from 1944 to 1953, testified that bad flooring and leaks were never repaired by Mr. Kean, despite numerous complaints. Minor repairs were, however, taken care of.

Everlina Leonard, tenant of 11D General Gade from 1945 to 1953, testified that while Mr. Kean painted the outside of the building he never fixed either the roof or the floor, both of which were in very bad condition.

Mary Foy, tenant of 25 Norre Gade from 1925 to 1953, stated that her floor was ripped up and roof leaking, neither of which was ever fixed, although windows and doors had been repaired by Mr. Kean. (This building is in such disrepair that it is now recommended to be torn down.)

Eric Harrigan, tenant of Vester Gade from 1940 to 1953, testified the flooring is full of holes and the roof leaks; that this condition has existed for a long time and that while Mr. Kean stopped up some of the leaks and painted the outside, he never did anything about the floors.

Mrs. Hein Christensen, tenant of 40A Taarneberg from 1946 to 1948, stated that there were leaks in several rooms, but only the leak in the parlour was ever fixed, and that the downstairs of the property was in such disrepair she was unable to use it. Also the cistern leaked and nothing was ever done about it.

Osmond Kean, who was the agent for the properties throughout the entire period and for all of the parties concerned, contends that practically all of these houses are very old wooden buildings which have deteriorated

35

as a result of wear and tear under tropical conditions and that to keep them in good repair would have eaten up all of the income from the properties. He testified that during the period of 1941 to 1947 he collected a total, in round figures, of $29,000 in rent from the properties in question and out of that sum spent a total, in round figures, of $13,000 for repairs. Kean also pointed out that he had to pay for taxes and insurances out of the rental and that all expenditures during this period amounted, in round figures, to $21,000, leaving only the net amount of $7,706.12 here in litigation.

The Court is of the opinion that the claim for waste has not been proved to the extent claimed by defendant Else Callwood, that the itemized statements of expenditure for repairs (exhibits Nos. 3, 4 and 5) do not show whether the expenses incurred by Else Callwood for repairs were for necessary repairs or for improvements to the properties. Nevertheless, the Court is satisfied from the testimony heard that the majority of the properties were in a state of disrepair not consonant with the duty imposed upon the life tenant, Anna Peiffer, in the will of Clifford Callwood, Sr., and that the properties did net an income sufficient to have permitted them to be kept in better repair. The Court recognizes the fact that these were old wooden buildings difficult to keep in good repair, but it is of the opinion that they could have been kept in better condition than that in which they were maintained by the agent of the life tenant and that, therefore, the life tenant, Anna Peiffer, did not comply to the extent possible, or necessary, with her obligation to maintain the properties in "proper condition."

In this connection, counsel for the Estate of Peiffer has drawn the attention of the Court to the case of In re Stout's Estate, 151 Or. 411, 50 P.2d 768, 774, 101 A.L.R. 672, 680, in which it was stated that:

"In ascertaining the amount which the remaindermen may be entitled to recover, the trial court should bear in mind that both the life tenant and the remaindermen were the intended objects of the bounty of the testator, H. B. Stout; that he undoubtedly was aware that the buildings in question would depreciate in value and to some extent become obsolete; and that unquestionably he did not expect that the entire income from the property would be used in payment of taxes and maintenance."

However, it is noted that the court, in the same case, went on to say:

"Nevertheless, there was a duty imposed upon the life tenant to make the ordinary repairs which a prudent person under the circumstances would make, at least to the extent of the income from the property."

Taking into consideration all of the above-mentioned facts and factors, the Court is of the opinion that a reasonable sum ought to be allowed to the succeeding life tenant, Else Callwood, to reimburse her, in part, for the waste committed by the previous life tenant, Anna Peiffer. Therefore, the Court, in the exercise of its discretion, determines that a reasonable estimate of the permissive waste in this case is $2,500 and that the defendant, Else Callwood, is, therefore, entitled to that amount for waste from the sum accumulated from rents. In support of this finding we cite the case presented by counsel, Prescott v. Grimes, 143 Ky. 191, 136 S.W. 206, 208, 33 L.R.A. (n.s.) 699, 676, where "the duty of the tenant to leave the property in reasonable condition and repair at the end of the term" was affirmed and the judgment against her estate held to be "reasonable" and "but a fair estimate of the damage occasioned by this neglect on her part."

### Iza Callwood

As to defendant Iza Callwood, the Court's opinion has already been stated under the section dealing with plaintiff's claim, to wit, that she was persuaded by the threats

37

and promises of Clifford Callwood to assign to him Anna Peiffer's property. It appears to the Court that under the difficult circumstances known to have existed in Germany at that time it is understandable that Iza Callwood was willing to assign this sum to her half-brother with the hope of being better provided for, especially considering the inadequacy of food rations in Germany during and immediately after the war.

██ ██ There is nothing, to the knowledge of this court, to prevent Iza Callwood now coming forth and denouncing the agreement made under conditions as outlined above and on the basis of promises by the plaintiff which have never been fulfilled and all of which this court has found amounted to fraud. False and fraudulent representations made by one party to a contract, by which the other party is induced to enter into the contract, render it voidable at the election of the defrauded party. 17 C.J.S., Contracts, § 165.

The fact that Iza Callwood is the sole heir of Anna Peiffer's estate cannot operate as a bar to her claim, especially as this was known to her at the time she signed the agreement in 1947, since she and Anna Peiffer had exchanged contracts of inheritance in 1943. She entered into the agreement disposing of the property of the aging Anna Peiffer, knowing that it would have come to her on Anna Peiffer's death. This fact makes stronger her allegations that she made the assignment under force of threats and attractive promises from plaintiff.

Estate of Peiffer

██ The estate of Peiffer is here in the position of a residuary legatee — what does not belong to anybody else belongs to the estate. The fact that Iza Callwood is the sole heir of the estate in no way affects the right of the estate to claim and recover what property belonged

to Anna R. Peiffer and was never legally transferred to anyone else.

### Summary

A summary of the Court's opinion and findings are, therefore, as follows:

The assignment of January 31, 1947, to defendant, Clifford W. L. Callwood, is void.

The oral assignment of defendant Else Callwood is void and of no effect, but her claim for waste is justified, and the sum of $2,500 is estimated by the Court as a reasonable allowance therefore.

Defendant Iza Callwood gets no part of the fund directly but only in so far as she is the sole heir and beneficiary of the Estate of Peiffer.

Defendant Estate of Peiffer is entitled to recover the balance of the fund after the above payments have been made plus such attorneys' fees and costs as are allowed against the fund.

The Court will hear the attorneys on the matter of what attorneys' fees should be allowed, and then order may be drawn in accordance with this opinion.

