**Wilma Cramp BURTOFF, Appellant,**

v.

**Samuel BURTOFF, Appellee.**

**No. 14153.**

District of Columbia Court of Appeals.

Argued Oct. 17, 1979.

Decided Aug. 20, 1980.

Rehearing and Rehearing En Banc Denied Oct. 7, 1980.

William Jordan Temple, Washington, D. C., for appellant.

Elizabeth Guhring, Washington, D. C., with whom Pamela Forbes Dulles, Washington, D. C., was on the brief, for appellee.

Before KELLY, GALLAGHER and MACK, Associate Judges.

GALLAGHER, Associate Judge:

This appeal concerns the validity of an antenuptial contract setting the spouses' rights to support upon dissolution of the marriage, an issue of first impression in the District of Columbia. We agree with the trial court that such contracts are not void per se on public policy grounds. After a careful examination of this antenuptial agreement according to the criteria set out below, we uphold the contract.

Dr. and Mrs. Burtoff were married on October 14, 1975, after a courtship of several years. Both parties were of mature years, with adult children from previous marriages. Dr. Burtoff insisted on an antenuptial contract to avoid a possible repetition of the property battle attendant to his first divorce, and to ensure that the bulk of his estate would pass to his children upon his death. Mrs. Burtoff resisted the idea, feeling the contract indicated a lack of trust on his part. Nevertheless, she signed, after it became apparent that Dr. Burtoff otherwise would not agree to the marriage. She was represented by counsel of her choice, who examined the agreement drawn up by Dr. Burtoff's attorney. Dr. Burtoff fully disclosed his considerable wealth, an estate of over a million dollars, by attaching an income tax return and a list of assets to the document. Mrs. Burtoff, an operating room nurse, also disclosed her $10,000 in assets and her salary for the preceding year, something under $8,000.

The contract called for a lump sum payment to Mrs. Burtoff on dissolution of the marriage, in full settlement of all obligations for support and maintenance, pendente lite or otherwise. The amount of the payment was keyed to the length of the marriage: $10,000 if the marriage lasted less than a year; $25,000 if the marriage lasted one to three years, and $35,000 if the marriage lasted longer than three years. If Dr. Burtoff were to die while the parties were still married, Mrs. Burtoff would receive $50,000.

After a few months of marriage, the couple began to experience difficulties, attributable in part to Mrs. Burtoff's resentment of the contract. Eight days before their first anniversary, while Mrs. Burtoff was attending a spiritualism class, Dr. Burtoff changed the locks on the couple's apartment and moved Mrs. Burtoff's belongings to another apartment he rented on her behalf. A private investigator hired by Dr. Burtoff handed her a letter as she left the class, explaining that he had effected a separation.

Mrs. Burtoff sued for pendente lite relief on March 15, 1977. The court held her motion in abeyance on the condition that Dr. Burtoff immediately tender $10,000 as provided for in the antenuptial agreement. A separate trial was held to determine the validity of the agreement. At this trial, the trial judge upheld the agreement in large part, but stated that the agreement would not control a spouse's support obligation before the marriage terminated; therefore, Mrs. Burtoff might be entitled to additional pendente lite support to prevent her from becoming a public charge. Mrs. Burtoff did not take further action to secure pendente lite relief until approximately ten months later, when Dr. Burtoff sued for absolute divorce. The court later granted the divorce but denied as moot the request for pendente lite support.

On appeal, Mrs. Burtoff makes four arguments.[1] (I) Her major contention is that the antenuptial contract contemplating divorce is void on public policy grounds. (II) Alternatively, if an antenuptial contract can be valid, she contends that Dr. Burtoff himself violated the contract's provision that he maintain $3,000 in her checking account at all times and consequently should be estopped from enforcing the contract against her. (III) If the contract is to be given effect, she maintains that the clause governing the length of marriage should be interpreted in such a way that she would receive $25,000 rather than $10,000.

1. Mrs. Burtoff also states that the court erred in failing to award her attorney fees and litigation expenses. Since the antenuptial agreement governed the award of fees, and in view of our decision upholding the agreement, we do not address this issue.

(IV) Finally, she challenges the denial of pendente lite support.

## I.

■ The validity of an antenuptial contract setting property rights at the death of a spouse has long been accepted in the District of Columbia. *Pollock v. Jameson*, 63 App.D.C. 152, 70 F.2d 756 (1934). Prospective spouses may contractually define their rights in property and waive rights that otherwise would arise as a matter of law. *See Snow v. Snow*, 50 App.D.C. 242, 270 F. 364 (1921). As is implied in the language of the following District of Columbia Code section, antenuptial contracts contemplating divorce are acceptable to arrange property rights.

> Upon the entry of a final decree of annulment or absolute divorce, in the absence of a valid antenuptial or postnuptial agreement in relation thereto, all property rights of the parties in joint tenancy or tenancy by the entirety shall stand dissolved . . . . [D.C.Code 1973, § 16–910 (amended 1977).]

Although antenuptial contracts relating to a spouse's rights in the other's estate at death or to property rights at dissolution of marriage are clearly acceptable in the District of Columbia, appellant contends that antenuptial contracts setting alimony are void because they encourage divorce and thus should be held to violate public policy.[2] Support for this argument is found in cases of a number of jurisdictions. The reasoning behind this view is well expressed in *Crouch v. Crouch*, 53 Tenn.App. 594, 604, 385 S.W.2d 288, 293 (1964):

> Such contract could induce a mercenary husband to inflict on his wife any wrong he might desire with the knowledge his pecuniary liability would be limited. In

other words, a husband could through abuse and ill treatment of his wife force her to bring an action for divorce and thereby buy a divorce for a sum far less than he would otherwise have to pay.

In particular, appellant relies on *Cohn v. Cohn*, 209 Md. 470, 121 A.2d 704 (1956), which involved an antenuptial contract similar to the one at issue here, with a lump sum payment in lieu of alimony, increasing with the duration of the marriage. The husband left the wife just prior to the time when the stipulated amount would have advanced from one level to the next, a circumstance which led the court to believe that the agreement induced the husband's desertion.

The reasoning in *Cohn* is no longer determinative today. Public policy considerations change along with societal conditions.

In the last ten years, courts in a number of jurisdictions have concluded that antenuptial agreements establishing rights to support upon divorce are no longer void ab initio as contrary to public policy. *E. g., Parniawski v. Parniawski*, 33 Conn.Supp. 44, 359 A.2d 719 (1976); *Posner v. Posner*, 233 So.2d 381 (Fla.1970); *Volid v. Volid*, 6 Ill.App.3d 386, 286 N.E.2d 42 (1972); *Buettner v. Buettner*, 89 Nev. 39, 505 P.2d 600 (1973); *Unander v. Unander*, 265 Or. 102, 506 P.2d 719 (1973).

In *Posner v. Posner, supra*, the Florida Supreme Court upheld the agreement because of the right of married couples to control their property:

> With divorce such a commonplace fact of life, it is fair to assume that many prospective marriage partners whose property and familial situation is such as to generate a valid antenuptial agreement settling their property rights upon the death of either, might want to con-

2. We have never addressed directly the question of the validity of an antenuptial contract which limits one spouse's duty to support the needy spouse after divorce. In *Mitchell v. Mitchell*, D.C.App., 310 A.2d 837 (1973), we applied New York law to void an antenuptial contract whereby a wife waived all right to support. Our decision was derived from a New York statute, section 5–311 of the General Obli-

gations Law, and case law interpreting this statute which stated that a "husband's obligation to support his wife continues after divorce [and] any separation agreement relieving him of his obligation or construed or applied so as to relieve him is void . . . ." *McMains v. McMains*, 15 N.Y.2d 283, 285, 206 N.E.2d 185, 187, 258 N.Y.S.2d 93, 95 (1965), *quoted in Mitchell v. Mitchell, supra* at 841.

sider . . .–and agree upon, if possible–the disposition of their property and the alimony rights of the wife in the event their marriage, despite their best efforts, should fail. [233 So.2d at 384.] *Accord, Parniawski v. Parniawski, supra* 33 Conn.Supp. at ——, 359 A.2d at 721.

We believe that an antenuptial agreement taking into consideration a future divorce is not necessarily void as against public policy. However, the court will scrutinize such an agreement more carefully than an ordinary contract, because of the likelihood that the contracting parties have not been dealing at arm's length. As the Florida Supreme Court said in *Del Vecchio v. Del Vecchio*, 143 So.2d 17 (Fla.1962), "[t]he relationship between the parties to an antenuptial agreement is one of mutual trust and confidence. Since they do not deal at arm's length they must exercise a high degree of good faith and candor in all matters bearing upon the contract." *Id.* at 21. We retain an interest in the marital relationship greater than our interest in other contractual subjects, and therefore will examine the facts in each case to decide if the agreement is valid.

■ The starting point of our examination is the contract's fairness. *Id.* at 20. If the contract is fair to both parties, then the party challenging the contract has the burden of proof on two further issues, namely, (1) whether the contract was voluntarily entered, and (2) after full disclosure of assets. If, on the other hand, the contract greatly disadvantages one spouse, then the other spouse will have the burden of showing that the disadvantaged spouse signed freely and voluntarily, with full knowledge of the other's assets. *Id.* at 20.

To decide whether an antenuptial contract is fair, we will look at many of the traditional factors which have been taken into consideration in granting alimony awards, such as the duration of the marriage, the age and health of the spouses, their respective economic condition and earning capacity, their contributions to the accumulation of property, and society's interest in preventing a person from becoming a public charge. *See Quarles v. Quarles*, 86 U.S.App.D.C. 41, 179 F.2d 57 (1949). In marriages of short duration, such as the Burtoffs', an agreement will be considered fair if it allows each spouse to live as well as before the marriage. *See Del Vecchio v. Del Vecchio, supra* at 20.[3] There was testimony to the effect that Mrs. Burtoff's award was calculated with reference to the amount she would have earned if she had continued to work during the marriage. By marrying, Mrs. Burtoff did not forgo any source of income, nor did she lose her ability to support herself through her profession.[4]

■ Since we find the agreement to be fair and reasonable, if she is to invalidate the agreement, Mrs. Burtoff must sustain the burden of proving either (1) that she signed under duress, or (2) that she did not have knowledge of Dr. Burtoff's wealth when she signed. She cannot prevail on either issue.

It is clear that Mrs. Burtoff signed the contract freely and voluntarily. The parties began to discuss the matter several months before the contract was executed. There was testimony to the effect that Dr. and Mrs. Burtoff negotiated terms and that the amount of the award to be granted after one year was raised in response to Mrs. Burtoff's suggestion. Mrs. Burtoff consulted her own attorney, and thus can be

3. In marriages of many years' duration, this standard may be inappropriate, since one spouse may sacrifice opportunities for self-advancement in order to maintain the home or promote the other spouse's career. In such cases, a better measure of fairness might be to enable the spouse to live according to the standard established during the marriage.

4. We do not address the situation where the antenuptial agreement bears no relationship to the subsequent situation of the parties. *Cf. Connolly v. Connolly*, 270 N.W.2d 44, 47 (S.D. 1978) (antenuptial contract held invalid). Florida courts have dealt with this possibility by finding that an antenuptial contract is modifiable for changed circumstances after the execution of the agreement, under Fla.Stat. § 61.14 (1973). *Posner v. Posner, supra.*

said to have understood any legal rights she might have waived.

Nor can there be any question that Mrs. Burtoff understood the extent of her husband's income and property. Dr. Burtoff fully disclosed his assets in documents attached to the antenuptial contract. Thus, after consideration of the circumstances involved, we uphold the agreement.

## II.

Mrs. Burtoff contends that Dr. Burtoff may not use the agreement as a defense in a court of equity because he violated a provision requiring him to maintain a joint checking account balance of $3,000. Paragraph 11 of the contract provided that

> Dr. Burtoff agrees that during the marriage of the parties he will at all times maintain a joint checking account with Mrs. Cramp having a balance of not less than $3,000. The balance in that account at the time of his death, should he predecease Mrs. Cramp during their marriage and while they are living together in good faith, shall become the sole property of Mrs. Cramp for the purpose of providing her with funds to ease her adjustment. Any tax thereon shall be borne by Dr. Burtoff's estate. The said funds shall not be deemed to be a set-off against any sums provided for Mrs. Cramp in this agreement or under any Last Will and Testament of Dr. Burtoff.

■ It is true, as appellant claims, that material failure of performance by one party who seeks to enforce a marriage agreement may preclude that party from relying on the agreement to defeat marital rights. See Travis v. Travis, D.C.App., 203 A.2d 173, 175–76 (1964) (wife's self help in collecting alimony did not so materially violate the terms of the separation agreement as to entitle husband to refuse performance on his part); Cooper v. Cooper, D.C.Mun.App., 35 A.2d 921 (1944) (husband's deducting a portion of his income tax from sums payable to wife did not constitute a breach such as to authorize the wife to rescind contract); Stuart v. Stuart, 77 U.S.App.

D.C. 200, 133 F.2d 411 (1943) (husband who fails to maintain life insurance policy and support child per separation agreement cannot demand performance of agreement by wife); Hammond v. Hammond, 76 U.S.App. D.C. 357, 360, 131 F.2d 351, 354 (1942) (spouse's breach of material provision of separation agreement regarding child custody bars his enforcement of the agreement); In re Estate of Hoffman, 63 N.J. 69, 304 A.2d 721 (1973) (husband's failure to support wife per separation agreement relieved her of obligation to endorse tax refund). This principle cannot be invoked, however, because Dr. Burtoff did not fail to comply with a material provision. Put another way, he was in substantial compliance with paragraph 11 of the agreement. See Matthew A. Welch & Sons, Inc. v. Bird, D.C. App., 193 A.2d 736 (1963) (doctrine of substantial performance recognized in District). Although he never kept $3,000 in the account, he did instruct his daughter and trustee to bring the account up to $3,000 immediately upon his death. Paragraphs 6 through 12 all dealt with the death of one of the parties. Clearly, the intention of paragraph 11 was to provide Mrs. Burtoff with cash and a place to live in the period immediately after her husband's death, should they still be living together when he died. That purpose was accomplished by the instruction to his trustee.

## III.

■ Mrs. Burtoff interprets the agreement to mean that the length of marriage should be calculated with reference to the date legal proceedings were instituted rather than the date Dr. Burtoff ejected her from the apartment. Under her interpretation she would receive $25,000 rather than $10,000.

The contract states:

> 4. Mrs. Cramp further agrees that in the event the contemplated marriage takes place, and then is terminated by divorce proceedings, or should any type of proceedings be instituted in any manner whatsoever pertaining to alimony and support, pendente lite or otherwise, that

she may claim to be due to her from Dr. Burtoff that:

(a) If *separation* shall occur within one calendar year of the date of the marriage, Mrs. Cramp will accept in full, final and permanent settlement of any or all obligation for support and maintenance due to her from Dr. Burtoff, the lump sum of Ten Thousand Dollars ($10,000).

(b) If *separation* shall occur within three calendar years of the date of marriage, Mrs. Cramp will accept in full, final, and permanent settlement of any and all obligation for support and maintenance due to her from Dr. Burtoff the lump sum of Twenty-Five Thousand Dollars ($25,000). [Emphasis supplied.]

Appellant contends that the definitional language in the main paragraph controls, rather than the reference to "separation" in the subparagraphs. She maintains that Dr. Burtoff's sole concern was the institution of a proceeding and therefore any ambiguity in the wording of the contract should be resolved to further his intention that a "proceeding" be the operative phrase. We find no ambiguity in paragraph 4. It is clear that the date of separation should be used to calculate the time period, because that is the term specified for the purpose. Since separation occurred within one year of marriage, the trial court correctly awarded Mrs. Burtoff $10,000.

## IV.

■ Mrs. Burtoff's final contention is that the trial court on the day it granted the final divorce erred in denying as moot her plea of retroactive pendente lite support. She points out that the court's September 16, 1977 opinion and order, which upheld the validity of the antenuptial agreement, also stated that the provision which provides for liquidated sums in full, final, and permanent settlement of any or all obligation for support and maintenance may be subject to modification based on the needs of the plaintiff, her ability to meet such needs, defendant's ability to pay, and the interests of the District of Columbia in

preventing her from becoming a public charge prior to the actual dissolution of the marriage.

We do not need to decide whether an antenuptial agreement can legally absolve one partner from the duty to support a spouse while the marriage endures because Mrs. Burtoff failed to make a proper showing, or to take the necessary steps to pursue her action, and therefore lost any claim to pendente lite relief she might otherwise have had.

Her first attempt was the motion for pendente lite relief, Civil Action S-36-77, filed on January 31, 1977, apparently pursuant to D.C.Code 1973, § 16-916 (maintenance of spouse). At the conclusion of the hearing, the court held the motion in abeyance upon the condition, agreed to by both counsel, that Dr. Burtoff provide his wife $10,000 in lieu of pendente lite relief, to be a credit against his ultimate obligation to be decided in the bifurcated trial. After the bifurcated trial on September 16, 1977, where the court upheld the agreement and stated that Mr. Burtoff could seek additional support for the period before the marriage terminated, Mrs. Burtoff failed to take any action to secure further relief in Civil Action S-36-77.

Dr. Burtoff filed for divorce in Civil Action D-3441-77 on October 10, 1977. Eight months later, on June 5, 1978, Mrs. Burtoff filed an answer to the divorce complaint, asking for pendente relief pursuant to D.C. Code 1973, § 16-911. However, no motion and affidavit, nor motions card, were filed to bring the matter before the court as required by Domestic Relations Rule 7(b)(1)(i). Thus, no hearing was held.

■ The support case and divorce case were consolidated, and final trial took place on September 18, 1978. At this hearing, the court refused Mrs. Burtoff's request to award her temporary support for the period from September 16, 1977. We find no abuse of discretion. *See Kreuz v. Kreuz*, D.C.App., 354 A.2d 867 (1976) (grant of temporary alimony committed to sound discretion of trial court); *Howard v. Howard*,

72 U.S.App.D.C. 145, 146, 112 F.2d 44, 45 (1940). The purpose of temporary alimony is to furnish a needy spouse with funds sufficient to prevent the spouse from becoming a public charge while his or her rights are being adjudicated. *Kreuz v. Kreuz, supra.* The language of D.C.Code 1978 Supp., § 16–911 plainly indicates that it is meant to provide relief "[d]uring the pendency of [an action] for divorce ...." As the court stated in *Cole v. Cole*, 82 U.S.App.D.C. 155, 161 F.2d 883 (1947) (court may not use contempt to enforce temporary support order when final divorce order made no reference to temporary support arrears):

> [O]nly so long as a suit for divorce is pending does the section authorize the court to require the husband to pay alimony and to enforce obedience by attachment and imprisonment. Any allowance of alimony which is to be effective after the suit for divorce has ceased to pend must be made under [the permanent alimony code provision]. [*Id.* at 157, 161 F.2d at 885.]

Thus, we conclude that the issue of temporary support was moot.

Accordingly, the judgment is

*Affirmed.*