801 P.2d 495

In re the Marriage of Kathy Ann
WILLIAMS, Petitioner–Appellee,

v.

Claude K. WILLIAMS, Jr.,
Respondent–Appellant.

No. 1 CA–CV 89–103.

Court of Appeals of Arizona,
Division 1, Department A.

Nov. 20, 1990.

M. Douglas Petroff–Tobler, P.C., Phoenix, for respondent-appellant.

Robbins & Green, P.A. by Joe M. Romley, Phoenix, for petitioner-appellee.

## OPINION

EHRLICH, Judge.

This is an appeal from a trial court order entered in dissolution proceedings. The husband has appealed from the decree of dissolution and the denial of his motion for new trial. He alleges that the trial court

erred in its conclusion of paternity and in its determination of his earning capacity.

## FACTS

Kathy Ann Williams and Claude K. Williams, Jr., were married on November 3, 1984. Prior to their marriage, they executed an antenuptial agreement as a part of which they agreed that all of the income received and obligations incurred during their marriage would be kept separate. They further agreed that in the event of divorce, neither would be entitled to an award of spousal maintenance.

The Williamses lived together from November 1984 until January 1986, when their relationship became estranged and the husband moved to Baltimore. In February 1986, the wife filed a petition for dissolution of their marriage. The following month, however, she visited her husband in Baltimore in a mutual effort to reconcile. After that visit, the wife discovered that she was pregnant. On November 23, 1986, she gave birth to a daughter.

The wife amended her petition for dissolution in July 1986 to include the fact of her pregnancy and a request for an award of child support. In the husband's response to the amended petition, he denied paternity of the child and denied that he had sufficient financial resources to support the child if, in fact, he was proven to be the child's father.

After the birth of the child, at the husband's request, and in order to resolve the paternity issue, the parties agreed to paternity testing at the husband's expense at the Genetics Center of the Southwest Biomedical Research Institute, located in Scottsdale. Tests were performed and the Genetics Center reported that there was a 99.93% probability that the husband was the father of the child.

The wife filed a second amended petition for dissolution, alleging that there was a minor child born of the marriage, that she was without sufficient funds to support herself and the child, and that she was unable to pay her attorney's fees and costs incurred in the action. The wife also requested that the court order the husband to pay child support and spousal maintenance.

The husband's counsel withdrew from representation and the husband filed his response to the second amended petition *in propria persona*. He again denied paternity of the child and requested that further tests be conducted to establish paternity conclusively. He also alleged that, according to the antenuptial agreement, the wife was not entitled to spousal maintenance and further, that he was without sufficient financial resources to pay his attorneys.

The husband made two subsequent requests that additional paternity tests be conducted, one request mailed directly to the trial court a month later, and a second request filed with the court another month later. These requests were denied by the court after oral argument.

The husband, still acting *in propria persona*, filed and served a request for production of documents upon the wife in which he asked that she produce certain documents at his office. Among the documents requested were those relating to the wife's financial situation, her health, the birth of the child, and the complications allegedly suffered by the wife as a result of the birth. The wife neither produced such documents nor timely objected to their production. Having earlier filed her list of witnesses and exhibits, the wife instead filed a motion to set and certificate of readiness alleging, as required by Maricopa County Local Rule 6.2.(a), that the parties had completed all discovery or had had a reasonable opportunity to do so. Trial of the matter then was set to begin on August 18, 1988.

On August 4, 1988, the husband, through his new counsel, moved the court to compel the wife to produce the documents previously requested and to continue the trial in order that discovery could be completed. The trial court denied the motion.

At the conclusion of the trial which then took place, the court held that the husband was the biological father of the child. It also found that the wife lacked sufficient property to provide for her reasonable needs and that she was unable to support

herself through appropriate employment. It concluded that the provision contained in the antenuptial agreement by which the parties had waived spousal maintenance was against public policy and thus unenforceable. Based upon these findings, the trial court ordered the husband to pay spousal maintenance to the wife in the amount of $850 per month for a period of eighteen months, and child support in the amount of $823 per month. The husband thereafter filed a motion for a new trial, which was denied by the trial court. He then timely appealed to this court.

## SPOUSAL MAINTENANCE

The husband alleges that the trial court erred in ordering him to pay spousal maintenance to the wife because the antenuptial agreement executed by the parties specifically provided that both parties waived an award of spousal maintenance upon divorce. The trial court held that this provision of the antenuptial agreement was void as against public policy, citing *Williams v. Williams*, 29 Ariz. 538, 544, 243 P. 402, 404 (1926).

Arizona recognizes the validity of certain antenuptial agreements: "Parties intending to marry may .enter into agreements not contrary to good morals or law." A.R.S. § 25–201(A). Clearly this statute was intended to sanction antenuptial agreements as long as they do not violate public policy. *Spector v. Spector*, 23 Ariz.App. 131, 137–38, 531 P.2d 176, 182–83 (1975). ■ The Arizona Supreme Court previously has held, however, in *Williams,* that an antenuptial agreement which purports to discharge a husband's duty of spousal support following divorce for a specific sum is contrary to public policy and void without reference to a particular agreement. The issue to be decided in this case, then, is whether the holding in *Williams,* that limitations on spousal maintenance contained in antenuptial agreements are against public policy *per se*, should be applied to void the waiver of spousal maintenance in this case, despite the changes in public policy regarding divorce that have occurred in Arizona in recent years. We agree with the husband's position that antenuptial agreements regarding spousal maintenance are no longer against public policy *per se*, and hold that such agreements must be considered individually to determine if the terms violate public policy.

The common law can and should be reformed when changed conditions and circumstances establish that it has become unjust or contrary to evolved public policy. *Ontiveros v. Borak*, 136 Ariz. 500, 504, 667 P.2d 200, 204 (1983). Thus, this court is free to reevaluate previous decisions such as *Williams* in light of present facts and circumstances. *Id.*

The decision in *Williams* was based upon two premises: Antenuptial agreements waiving spousal maintenance were considered to be against public policy first because they could result in a situation where the husband was relieved of his legal obligation to support his wife, although it was due to his fault that the wife sought and was granted a divorce. Such agreements also were against public policy because of the state's interest in the adequate support of its citizens; therefore, the husband's duty to support his wife could not be the subject of a contract between the parties.

The rationale articulated in *Williams* is less valid in light of the advent of "no-fault" divorce in Arizona. Arizona adopted Parts III and IV of the Uniform Marriage and Divorce Act in 1973. *See* A.R.S. §§ 25–311 through 25–339. In so doing, the legislature eliminated the concept of fault from divorce proceedings. Under the new statutory scheme, either party to a marriage may seek a divorce based upon their "irreconcilable differences," without assessing blame against the other spouse. A.R.S. § 25–312.

While the state still has an interest in enforcing the support obligations that accompany marriage, this principle no longer necessarily leads to the conclusion that all antenuptial agreements concerning spousal maintenance are invalid. While, in *Williams,* the spousal support obligation was strictly enforced against the husband

pursuant to the common law, the obligation is now statutory in nature, having undergone significant changes in recent years.

Prior to the 1973 revisions of A.R.S. § 25–319, which describes the spousal-maintenance obligation, and A.R.S. § 13–803 (now A.R.S. § 13–3611), it was clearly the husband's duty to support his wife during their marriage. This obligation arose out of the relationship itself and existed irrespective of the wife's separate estate or independent means. *Ivancovich v. Ivancovich,* 24 Ariz.App. 592, 595, 540 P.2d 718, 721 (1975). In fact, according to A.R.S. § 13–803, as it existed prior to 1973, an able husband who refused or neglected to support his wife was guilty of a felony.

A.R.S. § 25–319 now says that either spouse may be ordered to pay maintenance to the other if certain contingencies are fulfilled. Additionally, A.R.S. § 13–3611 provides that it is a class six felony for an able spouse, regardless of gender, to refuse to support the other during marriage if the need arises. Thus, the spousal-support obligation, both during marriage and after divorce, today is borne equally by both parties.

The state still has an interest in the support of its citizens, however. *Frey v. Frey,* 298 Md. 552, 471 A.2d 705, 709–10 (1984). Consequently, antenuptial agreements which affect this obligation are still subject to scrutiny on public policy grounds. The majority of jurisdictions in this country which have considered this issue have adopted the view that antenuptial agreements affecting spousal maintenance are not *per se* against public policy, but that they must be considered on a case-by-case basis. *See MacFarlane v. Rich,* 567 A.2d 585, 588 (N.H.1989); *Warren v. Warren,* 169 Ill.App.3d 226, 119 Ill.Dec. 924, 926–27, 523 N.E.2d 680, 682–83 (1988); *Frey,* 471 A.2d at 710; *Hill v. Hill,* 356 N.W.2d 49, 53 (Minn.App.1984); *Gross v. Gross,* 11 Ohio St.3d 99, 464 N.E.2d 500, 506 (1984); *Newman v. Newman,* 653 P.2d 728, 731 (Colo.1982); *Osborne v. Osborne,* 384 Mass. 591, 428 N.E.2d 810, 816 (1981); *Burtoff v. Burtoff,* 418 A.2d 1085, 1088

(D.C.1980); *Ferry v. Ferry,* 586 S.W.2d 782, 785 (Mo.App.1979); *Matlock v. Matlock,* 223 Kan. 679, 576 P.2d 629, 633 (1978); *Buettner v. Buettner,* 89 Nev. 39, 505 P.2d 600, 603 (1973); *Unander v. Unander,* 265 Or. 102, 506 P.2d 719, 721 (1973); *Posner v. Posner,* 233 So.2d 381, 383 (Fla.1970). These recent cases indicate that in order to be enforceable and comport with public policy, antenuptial agreements regarding spousal maintenance must be fair and equitable in their procurement an in their result. *Frey,* 471 A.2d at 711. Specifically, the agreements must be fairly entered into upon full disclosure, *Unander,* 506 P.2d at 721, and without fraud, overreaching or duress. *Buettner,* 505 P.2d at 604. Additionally, the results must not be made unconscionable by circumstances existing at the time of the marriage dissolution, such as when enforcement of the spousal maintenance waiver provision would render one spouse without a means of reasonable support or a public charge, either because of a lack of property resources or a condition of unemployability. *Newman,* 653 P.2d at 734; *Hill,* 356 N.W.2d at 57; *Gross,* 464 N.E.2d at 509.

In specifically addressing the issue of antenuptial agreements regarding spousal maintenance and the state's interest in the support obligation, the court in *Gross* stated:

> In the review of provisions of antenuptial agreements regarding maintenance or sustenance alimony, a further standard of review must be applied—one of conscionability of the provisions at the time of the divorce or separation. . . .

We believe that the underlying state interest in the welfare of the divorced spouse, when measured against the rights of the parties to freely contract, weighs in favor of the court's jurisdiction to review, at the time of a subsequent divorce, the terms in an antenuptial agreement providing sustenance alimony for one of the parties. There is sound public policy rationale for not strictly enforcing such a provision which, even though entered into in good faith and reasonable at the time of execution, may have become unreasonable or uncon-

scionable as to its application to the spouse upon divorce. It is a valid interest of the state to mitigate potential harm, hardship, or disadvantage to a spouse which would be occasioned by the breakup of the marriage, and a strict and literal interpretation of the provisions for maintenance of the spouse to be found in those agreements.

464 N.E.2d at 509.

We find that the principles articulated above, as well as in the other cases previously noted, are persuasive and consistent with the Arizona legislature's intent in amending the laws pertaining to divorce. Therefore, we hold that it is no longer valid to simply reject an antenuptial agreement regarding spousal maintenance on general public policy grounds. An inquiry must be conducted regarding whether the agreement between the parties was fairly reached and whether it adequately provides for support of the spouse consistent with the needs and resources of both spouses at the time of dissolution.

Because the trial court relied upon *Williams* in holding that the spousal maintenance waiver provision of the antenuptial agreement was void, we remand this issue to be considered in light of the test we have articulated.

## PATERNITY TESTING

The husband argues that the trial court erred in denying his requests for additional paternity testing. He claims that A.R.S. § 12–847(D) affords him an absolute right to additional tests, and therefore he asks this court to remand the case for a new trial in which he would be allowed to conduct additional genetic testing.

Interpretation of a statute involves the resolution of legal rather than factual issues. *Arizona State Board of Accountancy v. Keebler*, 115 Ariz. 239, 241, 564 P.2d 928, 930 (App.1977). Accordingly, we are not bound by the trial court's conclusions of law and conduct our review *de novo*. *Id.*

There is, in Arizona, a rebuttable presumption that a child who was conceived and born during the time that a husband and wife were married is the husband's child. *State v. Mejia*, 97 Ariz. 215, 218, 399 P.2d 116, 117 (1965). It is undisputed that the child involved in this case was conceived and born during the course of the parties' marriage. The presumption thus exists that the husband is the father of the child. Given the presumption of paternity, the burden of proof is on the husband to prove that he is not the father of the child. Arizona Revised Statutes § 12–841 et seq. provides a procedure by which, in a paternity action, paternity testing can be ordered. Specifically, A.R.S. § 12–847 provides in pertinent part:

C. The court, on its own motion, or on motion of any party to the proceedings, shall order the mother, her child or children and the alleged father to submit to the drawing of blood samples or the taking of deoxyribo-nucleic acid probe samples, or both, and shall direct that inherited characteristics, including but not limited to blood and tissue type, be determined by appropriate testing procedures. An expert duly qualified as an examiner of genetic markers shall be agreed upon by the parties or appointed by the court to analyze and interpret the results and report to the court.

D. The examiner's report shall be admitted at trial unless a timely challenge to the testing procedures or the results has been made within the time allowed by the court. If the results of the examiner's report have been challenged, the court shall order an additional test be made by the same laboratory or an independent laboratory at the expense of the party requesting additional testing.

█ In this case, the husband and the wife agreed that a paternity test would be conducted, and indeed agreed where the test would be performed. After the results from that test showed that there was a 99.93% probability that the husband was the father of the child, the wife amended her petition for dissolution and requested child support and spousal maintenance. The husband continued to deny paternity, and asked that further testing be conducted to more conclusively resolve the issue.

After oral argument on the issue, the trial court denied the husband's requests.

In order for the husband to be entitled to a second test under the statute, he must have properly challenged the test within the appropriate time. It is unclear from the trial court's minute entry what rationale it relied upon in denying the husband's requests for further paternity testing. However, because the facts surrounding the husband's request are undisputed, this court may substitute its own analysis of the record in determining whether the trial court abused its discretion in denying the requests for further testing. *Costanzo v. Stewart*, 9 Ariz.App. 430, 433, 453 P.2d 526, 529 (1969); *Bodco Building Corp. v. Arizona State Tax Commission*, 5 Ariz. App. 589, 590, 429 P.2d 476, 477 (1967). "Abuse of discretion" has been defined as an exercise of discretion which is manifestly unreasonable, exercised on untenable grounds or for untenable reasons. *Quigley v. City Court of the City of Tucson*, 132 Ariz. 35, 37, 643 P.2d 738, 740 (1982); *Torres v. North American Van Lines, Inc.*, 135 Ariz. 35, 40, 658 P.2d 835, 840 (App.1982).

Pursuant to A.R.S. § 12–847(D), the examiner's report "shall be admitted at trial unless a timely challenge to the testing procedures or the results has been made within the time allowed by the court." Here, the trial court did not establish the time in which the husband could challenge the test. In the absence of a court order setting forth a time in which to file a challenge to the testing procedures and/or to the results, we will interpret the statute as allowing a challenge within a reasonable time of the issuance of the test results. The husband filed three requests for a new test during the five months after the issuance of the results. We find that these challenges were made within a reasonable time after the test results were released and, therefore, that he fulfilled that requirement of the statute.

■ The statute does not define what constitutes a valid "challenge to the testing procedures or results." Based upon general principles of statutory construction, we interpret a valid challenge to consist of a particularized objection to the paternity test and/or result, reasonably supported by indicia of its objectionable nature. *See generally City of Phoenix v. Superior Court*, 144 Ariz. 172, 175–76, 696 P.2d 724, 727–28 (App.1985) (when interpreting statutes, courts will apply sensible construction); *Lake Havasu City v. Mohave County*, 138 Ariz. 552, 555, 675 P.2d 1371, 1374 (App.1983) (courts will apply statute in manner to avoid absurd results). To otherwise define the term "challenge" in this context as simply requiring a general objection to the results, would lead to an absurd conclusion: The challenger could delay the paternity proceedings indefinitely with repeated, baseless requests for additional testing.

■ Here, the husband's requests were no more than a general objection to the results of the first test. The husband only argued, without specificity, that an additional test is necessary because there is allegedly a type of test available that is "more technically advanced" than the first test. No evidence was presented as to whether that type of test was available at the time of the stipulated first test, in what respect it is better, or how its results would be "more conclusive" than those of the first test. We find that because the husband did not sufficiently articulate and support the nature of his objection to the first test, his objection did not constitute a valid challenge under the statute. Therefore, given that the husband was afforded a paternity test of a type and at a location agreed to by him, and given that he is unable to identify any failing in the test or why the newly-suggested test would be better, the trial court's ruling does not constitute an abuse of discretion.

## COMPLIANCE WITH DISCOVERY

The husband alleges that he was denied a fair trial because the trial court refused to order the wife to comply with his discovery requests. Although we have some concern that the discovery was not sufficiently reciprocal, because we are remanding this case to the trial court, it is unnec-

essary for us to determine whether the discovery proceedings denied the husband a fair trial. There will be an adequate opportunity for complete consideration of this subject upon remand.

## HUSBAND'S EARNING CAPACITY

■ The trial court attributed income to the husband in the amount of $4,000 per month, and ordered him, based upon this amount, to pay spousal maintenance in the amount of $850 per month for eighteen months and child support in the amount of $823 per month. The husband claims that the trial court abused its discretion because there was no evidence presented at trial indicating that he was capable of earning $4,000 per month. We disagree.

First, the husband testified at trial that he had earned approximately $4,000 per month for certain periods of time in the past. Specifically, he testified that during 1986, he had worked as a consultant for approximately three to four months. During that period, he was paid on a "project-by-project" basis, earning an average of approximately $4,000 per month. He also testified at trial that, over the past years, his "take home pay" averaged approximately $3,000 per month, plus payment of expenses such as the use of a car and car insurance.

This court has determined that future earnings and/or earning capacity may be considered by the trial court. *Mitchell v. Mitchell*, 152 Ariz. 312, 316, 732 P.2d 203, 207 (App.1985). Regarding his earning potential, the husband testified that he has a college education and that he has worked in the real estate construction and development business for many years. He had been successfully self-employed in the real estate development business in Arizona and Texas, and had had a personal net worth of several million dollars when the parties married. The husband testified that he was in good physical health, and that, at the time of trial, he had been employed as a real estate consultant in Texas for more than a year. Indeed, he anticipated earning a $7,500 commission from a real estate transaction scheduled to close in 1988, and

he possessed a $60,000 promissory note payable to him for consulting work at the rate of $750 for each unit sold in a development.

Based upon the testimony regarding the husband's past earning history and his future earning capacity, we do not believe that the trial court erred in attributing income to the husband in the amount of $4,000 per month.

## ATTORNEY'S FEES

The wife has requested an award of attorney's fees and costs incurred in the preparation of this appeal. Upon remand, the trial court may consider this request in light of A.R.S. § 25–324.

This matter is remanded for proceedings consistent with this decision.

FIDEL, P.J., and CONTRERAS, JJ., concur.