**TAMI ALLISION DYSART, Plaintiff**
**v.**
**ROBERT LEWIS DYSART, Defendant**

Family No. D196/2001

Territorial Court for the Virgin Islands

Division of St. Thomas and St. John

December 17, 2002

118

119

GEORGE MARSHALL MILLER, ESQ., St. Thomas, VI, *Attorney for Plaintiff*

MICHAEL FITZSIMMONS, ESQ., Stryker, Duensing, Casner & Dollision, St. Thomas, VI, *Attorney for Defendant*

HODGE, *Judge*

## MEMORANDUM OPINION

(December 17, 2002)

Before the Court is Defendant's Motion for Partial Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure,[1] in which Defendant claims that the prenuptial agreement signed by both parties should control all matters encompassed therein. This Court has found no relevant case law concerning the propriety of prenuptial agreements in this jurisdiction. Nevertheless, this Court concludes that the prenuptial agreement is valid with respect to the matters that it addresses; and, upon that limited basis, partial summary judgment shall be granted. However, because the prenuptial agreement does not address issues such as spousal support, the disposition of commingled funds, and the disposition of post-marital property, it cannot control the resolution of any disputes arising from those matters.

### FACTS

On September 7, 1990, Plaintiff Tami Allison Dysart ("Tami") and Defendant Robert Lewis Dysart ("Robert") entered into an Antenuptial Agreement ("Agreement"). (*See* Agreement at Def.'s Mem. in Supp. of Mot. for Partial Summ. J. at ex. A.) The parties were married later that same day. In the Recitals preceding the Agreement, the parties agreed that neither of them had acquired any interest whatsoever in any income, property, or obligation of the other prior to their marriage. (*Id.* Recital B.) The parties agreed that they had the opportunity to examine the financial records and books of the other, and that either party's failure to examine those records constituted a knowing waiver to do so. (*Id.* Recital D.) The parties further agreed that they intended to remain in Arizona following their marriage, and that both parties had consulted independently with counsel concerning applicable Arizona laws. (*Id.* Recital G.)

---

[1] Made applicable to this Court, to the extent that they are not inconsistent with local law, through Rule 7 of the Rules Governing the Territorial Court of the Virgin Islands. *See* Revised Organic Act of 1954, § 21(c), 48 U.S.C. 1611(c), *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 150 (1995) (preceding V.I. CODE ANN. tit. 1) ("[T]he rules governing the practice and procedure of the courts established by local law ... shall be governed by local law or the rules promulgated by those courts.").

Both parties agreed that any property that they individually possessed prior to the marriage or subsequently acquired would remain their respective separate property. (*Id.* ¶¶ 3-4.) Exhibit A to the Agreement listed Robert's separate assets and obligations, which included various financial and brokerage accounts, a checking account, a house, "miscellaneous items of personalty," 49% interest in a local legal corporation, an outstanding note, and various whole life and term insurance policies. (*Id.* at ex. A.) None of the recorded assets listed their corresponding value or worth. (*Id.*) The parties further designated that a certain portion of their income and earnings would constitute community property. (*Id.* ¶ 5.) Both parties waived, without elaboration, any interest in the other's pension or retirement benefits. (*Id.* ¶ 6.)

The parties delineated a series of expenses that would be paid from the community-income pool. These expenses included taxes, maintenance on the family dwelling (owned by Robert), food, utilities, medical expenses, Tami's education, child support for Robert's children, Robert's life insurance premiums, and the living expenses for Tami's son. The parties agreed that any payments made by either party for expenses that exceeded the assets of the community-income pool would constitute a gift. (*Id.* ¶ 7.)

Both parties waived any interest in the other's education or profession, (*id.* Recital F & ¶ 8), and the parties made provisions for the support of their existing children, (*id.* ¶ 9). The parties agreed that neither party could incur a community expense in excess of $3,000 without securing the other party's written permission. (*Id.* ¶ 10.) Both parties waived any community interest in compensation for services rendered on behalf of the other party's property, the prior or subsequent debts assumed by the other party, and the management or disposition of the other party's separate property. (*Id.* ¶¶ 11-13.) The parties also provided for a specific amount of insurance coverage for Robert. (*Id.* ¶ 15.)

Significantly, although both parties agreed to waive any community property rights that they might have or subsequently incur under law, the parties specifically redacted language that would have limited either party's statutory rights to certain claims under domestic relations law, such as a family allowance and a probate homestead. (*Id.* ¶ 14.) Furthermore, the parties noted that, although many courts have recognized the validity of prenuptial agreements, courts have also found that the pre-marital resolution of support and custody rights are void as

against public policy. (*Id.* ¶ 16.) Finally, the parties agreed that any modification to the Agreement must be made in writing. (*Id.* ¶ 18.)

## DISCUSSION

In his motion for partial summary judgment, Robert contends that, inasmuch as the parties intended to allocate their respective marital and property rights through contractual means, the Agreement should be adjudged as valid and controlling of all the issues that it encompasses. (Def.'s Mem. in Supp of Mot. for Partial Summ. J. at 1.) Robert argues that, in assessing the validity of the Agreement, the laws of the State of Arizona should apply. (*Id.* at 2.) Robert claims that Tami has never alleged that any fraud, coercion, or undue influence affected her decision whether to enter into the Agreement. (*Id.* at 6.) Robert maintains that, because Tami, as the non-drafting party, had thirty days to examine the Agreement and availed herself of counsel, she had full knowledge both of the property involved and her attendant rights. (*Id.* at 6-7.) Robert also claims that, due to Tami's marketable skills and her former employment as a legal secretary, the Agreement was both fair and equitable by any measure. (*Id.* at 7-8.) Richard ends by declaring that Tami, who allegedly never challenged the validity of the Agreement during eleven years of marriage, should not be allowed to repudiate the Agreement solely because she now finds it to be "inconvenient." (*Id.* at 8.)

In her opposition to Robert's motion, Tami concedes that this matter is governed by Arizona law. (Pl.'s Opp'n to Mot. for Summ. J. at 1.) Tami points out that the Agreement "is silent as to what the parties intended to happen in the event of a separation and divorce," noting further that the Agreement does not provide for spousal support, child support, post-marital property, or post-marital commingled funds. (*Id.* at 2.) Tami admits that her attorney warned her not [to] sign the Agreement. (T. Dysart Aff. ¶ 2.) Nevertheless, Tami maintains that, as a result of an argument with Robert and her fear of embarrassment should the wedding be cancelled, she was coerced into signing the Agreement on the day of the marriage ceremony. Tami claims both that she had not seen a final draft of the Agreement until that day, and that she was unclear about some of the Agreement's provisions. (Pl.'s Opp'n to Mot. for Summ. J. at 2-3; T. Dysart Aff. ¶ 2.) Tami also contends that, because the Agreement's inventory of existing property was vague, she was uninformed regarding the nature and the extent of her corresponding

rights. (Pl.'s Opp'n to Mot. for Summ. J. at 3-4; T. Dysart Aff. ¶ 3.) Finally, Tami claims that the Agreement's failure to account for spousal support and jointly-acquired community property renders it inequitable. (Pl.'s Opp'n to Mot. for Summ. J. at 4-6; T. Dysart Aff. ¶¶ 4-5.)

Robert replies that Tami's claims of coercion are unfounded, given that, *inter alia*, Tami has twice reaffirmed in writing her commitment to the Agreement. (Def.'s Reply to Pl.'s Opp'n to Mot. for Partial Summ. J. at 1-3.) Robert also characterizes as spurious Tami's allegations that she was not given an opportunity to examine his books and financial records prior to signing the Agreement. (*Id.* at 3-4). Robert does not directly address the lack of a spousal support provision in the Agreement, but charges that Tami has failed to offer any evidence of the commingling of funds. (*Id.* at 4-6.)

## 1. Summary Judgment Standard

■■ Rule 56 of the Federal Rules of Civil Procedure provides that judgment shall be rendered in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The standard for partial summary judgment is identical to the standard for full motions for summary judgment. *URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ.*, 915 F. Supp. 1267, 1279 (D.R.I. 1996). The moving party bears the burden of proving that no material issue of fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). A dispute over a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Suid v. Phoenix Fire & Marine Ins. Co.*, 26 V.I. 223, 225 (D.V.I. 1991). Once the moving party has carried its initial burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (quoting FED. R. CIV. P. 56(e)) (internal quotations omitted). *See also Skopbank v. Allen-Williams Corp.*, 39 V.I. 220, 227-28 (D.V.I. 1998) (stating that nonmoving party must provide evidence that is sufficiently probative and more than a colorable substantiation in support of its case). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the

moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The role of the court is not to weigh the evidence for its truth or credibility, but merely to ascertain whether a triable issue of fact remains in dispute. *Suid*, 26 V.I. at 225. The nonmoving party receives "the benefit of all reasonable doubts and inferences drawn from the underlying facts." *Aristide v. United Dominion Constructors, Inc.*, 30 V.I. 224, 226 (D.V.I. 1994).

## 2. Marriage Contracts

The issue before this Court is whether the contested prenuptial Agreement is valid and enforceable in the Virgin Islands. This issue has not been addressed in any reported decision in this jurisdiction. Aside from a provision of the Virgin Islands Statute of Frauds requiring that any "agreement, promise, or undertaking made upon consideration of marriage" be reduced to writing, 28 V.I.C. § 244, local law is silent on the specific issue of prenuptial contracts. Even the law as chronicled by the Restatement of Contracts reflects uncertainty with respect to "matrimonial contracts."[2] *See* RESTATEMENT (SECOND) OF CONTRACTS § 19 (Reporter's Note to cmt. c) (suggesting that "contracts within the family present problems more of family law than of the law of contracts"); *But see id.* § 73 cmt. d, illus. 9 (regarding marriage as valid consideration for a promise made by a third party). At most, the Restatement prohibits marriage contracts that interfere in some way with the marital relationship. *See id.* §§ 189-90 (barring marriage contracts that either unreasonably restrain marriage or unreasonably induce divorce).

---

[2] "The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute ... as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands ... in the absence of local laws to the contrary." 1 V.I.C. § 4.

■ Other jurisdictions possess more developed case law in this regard. In general, prenuptial or antenuptial agreements have been regarded in favorable terms and recognized as binding upon the parties as any other contractual agreement. *Jones v. Estate of Jones*, 253 Wis. 2d 158, 646 N.W.2d 280, 285 (2002). The interpretation of prenuptial agreements is governed by standard contract principles. *Fletcher v. Fletcher*, 68 Ohio St. 3d 464, 628 N.E.2d 1343, 1346 (1994). Prenuptial agreements enjoy both a presumption of validity and liberal construction as to their terms so that the intent of the parties may be realized. *Anderl v. Willsey*, 193 Neb. 698, 229 N.W.2d 46, 49 (1975). Thus, unambiguous terms and provisions are controlling, and any interpretation of ambiguous provisions should comport with the discernible intent of the parties. *MacFarlane v. Rich*, 132 N.H. 608, 567 A.2d 585, 588 (1989).

### 3. Choice of Law

■ Both parties agree that Arizona law should govern the interpretation of the Agreement. A brief survey of choice-of-law doctrines reveals that such a determination is appropriate. The Second Restatement of Conflict of Laws directs that, where the parties have explicitly provided, the parties' choice of law should control. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(1). However:

> In the absence of an effective choice of law by the parties ... the contacts to be taken into account ... to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* § 188(2). In this case, although the parties made reference to Arizona law, the Agreement contains no explicit choice-of-law provision. But,

126

taken together with the elements of the "significant relationship" test set forth in the Restatement, these references to Arizona law that militate in favor of finding that the parties intended that their Agreement be governed by the laws of Arizona. Not only was Arizona the place of negotiation and execution of the Agreement, it was also, at the time, the intended residence of the parties, (*see* Agreement Recital G), and the location of the separate and community assets of the parties. *See Callwood v. V.I. Nat'l Bank*, 3 V.I. 3, 24-25, 121 F. Supp. 379, 389-90 (D.V.I. 1954) (reciting the older rule that matters bearing on the execution, interpretation, and validity of a contract are governed by the law of the place of making), *vacated on other grounds*, 3 V.I. 540, 221 F.2d 770 (3d Cir. 1955). Thus, this Court must turn to Arizona law to resolve this matter.

## 4. Validity of the Agreement

 Under Arizona law in force at the time of the execution of this Agreement,[3] a prenuptial agreement is valid if it is "not contrary to good morals or law." ARIZ. REV. STAT. ANN. § 25-201(A) (West 1976). To be valid, "[t]he agreement must be free from any taint of fraud, coercion[,] or undue influence; the prospective wife must have acted with full knowledge of the property involved and her rights therein, and the agreement must have been fair and equitable." *Spector v. Spector*, 23 Ariz. App. 131, 531 P.2d 176, 185 (1975); *In re Estate of Harber*, 104 Ariz. 79, 449 P.2d 7, 16 (1969). Allegations of coercion may be rebuffed where the non-drafting spouse has had an opportunity to consult with legal counsel. *Spector*, 531 P.2d at 185. With respect to fairness, a court will look to the positions of the parties at the time of their contracting, *see id.*, but will not countenance a contract that is against public policy at the time of divorce, *see Williams v. Williams*, 166 Ariz. 260, 801 P.2d 495, 498 (1990) (concerning spousal support).

---

[3] Arizona amended its law governing the validity of prenuptial agreements in 1991. *See* ARIZ. REV. STAT. ANN. § 25-202 (West 1999). For his analysis of the validity of prenuptial agreements executed prior to 1991, Robert relies on the case of *Hess v. Hess*, Nos. 1 CA-CV 91-0233 & 1 CA-CV 92-0185, 1993 Ariz. App. LEXIS 244 (Ariz. Ct. App. 1993). (*See* Def.'s Mem. in Supp of Mot. for Partial Summ. J. at 5.) This case, however, has since been vacated and withheld from publication. As such, it would be improper to rely on *Hess* as an accurate statement of Arizona law.

■ In this case, despite her contentions to the contrary, nothing suggests that Tami was the victim of coercion or duress. In Arizona, duress "is an act or threat that results in the preclusion of the exercise of free will and judgment." *USLife Title Co. of Ariz. v. Gutkin*, 152 Ariz. 349, 732 P.2d 579, 587 (1986). The Restatement of Contracts also recognizes duress where "a person makes an improper threat that induces a party who has no reasonable alternative to manifesting his [or her] assent." RESTATEMENT (SECOND) OF CONTRACTS § 175 & Introductory Note to Topic 2. Assuming, *arguendo*, that the specter of the cancellation of wedding plans constitutes a threat, the evidence does not indicate either that Tami's free will was overborne or that she had no reasonable alternative at her disposal. It is true that the presentation of a prenuptial agreement only a short time before a marriage ceremony may suggest overreaching or coercion if the postponement of the wedding would cause severe embarrassment or hardship, *Fletcher*, 628 N.E.2d at 1348, or if the disadvantaged party did not have sufficient time to consult with an attorney, *Peters-Riemers v. Riemers*, 2002 N.D. 72, 644 N.W.2d 197, 207 (2002). Generally speaking, however, mere social embarrassment that results from the cancellation of wedding plans has been held to be a reasonable alternative to entering into an unsatisfactory marriage contract. *See, e.g., In re Marriage of Spiegel*, 553 N.W.2d 309, 318 (Iowa 1996). Furthermore, Tami concedes that she showed the Agreement to an attorney who was unaffiliated with either the negotiation or drafting of the contract. Although it is apparent that the ultimate signing of the contract may have taken place under less than ideal circumstances, this Court does not believe that these circumstances constituted duress under Arizona law. Thus, Tami cannot defeat Robert's motion for partial summary judgment on grounds that she signed the Agreement as a result of improper coercion or duress.

■ Turning to whether Tami fully understood the property rights at stake in the Agreement, Tami fails to demonstrate that she was deprived of an opportunity to examine Robert's books and financial statements. Tami's contention otherwise is undermined by the inclusion of a provision in the Agreement that states that both parties made their financial records available to the other, and that failure of a party to inspect those records constitutes a waiver of the right of inspection. (*See* Agreement Recital D.) Tami offers no proof that she was unable to assess the value of Robert's separate property, as set forth in Exhibit A to

the Agreement. Although this exhibit may not have been, as Tami insists, a model of clarity, Tami cannot demonstrate that her understanding of her property rights was compromised by the Agreement. Accordingly, Tami's challenge to Robert's motion for summary judgment on this point must fail.

█ Finally, Tami's challenge to the fairness and equity of the Agreement is not persuasive. Arizona law is largely silent on this element in the context of marriage contracts, but other courts have concluded that, in determining the fairness or equity of a prenuptial agreement, a court may look to the education, intelligence, life experience, and legal or financial literacy of the respective parties. *Banks v. Evans*, 347 Ark. 383, 64 S.W.3d 746, 749 (2002). A Court may look to whether there was overreaching by the drafting party, in that "in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement." *Harbom v. Harbom*, 134 Md. App. 430, 760 A.2d 272, 282 (2000).

█ In this case, the evidence is clear that Tami provided her attorney with a copy of the Agreement for his opinion. It is clear that Tami had the opportunity to examine to some degree Robert's financial statements. It is also clear that changes were made to the Agreement and were endorsed by both parties. Although there is some dispute as to when Tami was first shown the Agreement, it is clear that it was no later than two weeks prior to the marriage ceremony. Furthermore, it is clear that, although not an attorney, Tami is an intelligent and articulate individual with a certain amount of legal literacy. It is beyond questioning that, even assuming that her attorney warned her otherwise, Tami chose to execute the Agreement. In light of this evidentiary record, taken in the light most favorable to Tami, this Court cannot conclude that the Agreement was unduly inequitable. Moreover, to the extent that Tami argues that the Agreement is unconscionable contract of adhesion, she fails to demonstrate that "such a contract ... does not fall within the reasonable expectations of the [non-drafting party]" or that any of its terms are "unduly oppressive." *Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 173 Ariz. 148, 840 P.2d 1013, 1016 (1992). Thus, Tami cannot defeat the motion for partial summary judgment on this point.

## 5. Scope of the Agreement

 Accordingly, from the foregoing analysis, the Court concludes that the Agreement is a valid prenuptial agreement under Arizona law. It is important, however, to note exactly the extent of the Agreement's validity. Recital E of the Agreement states that:

> It is the desire of both parties hereto to determine forever all rights and interests of either party in any property (real, personal[,] or mixed) wheresoever situated, that either party may own now, that either party may own or acquire subsequent to the execution of this Agreement ... or that either party may own, earn[,] or acquire during a marriage between them.

(Agreement Recital E.) However, even a cursory reading of the contract suggests that Agreement does not go as far as Recital D would suggest. As Tami notes, and the Court agrees, the Agreement does not address issues such as spousal support, the disposition of commingled funds, and the disposition of post-marital property. (*See* Pl.'s Opp'n to Def.'s Mot. for Partial Summ. J. at 2.) Thus, the Agreement cannot control the resolution of any disputes that may arise from those particular matters.

 In addition, even though the contract is a valid prenuptial agreement, it is not immune from attacks upon its individual provisions that are premised upon other tenets of contract law. For example, Tami alleges that the Exhibit A to the Agreement is vague in its recitation of Robert's assets. (*See id.* at 3-4.) Although the alleged imprecision of Exhibit A could not sustain Tami's claim that she did not understand the property-rights provisions of the Agreement, nothing prevents Tami from challenging the value of those assets as they relate to any spousal-support issues. Put differently, because Exhibit A does not list the value or worth of any of Robert's assets, Tami is free to question the value or worth of those assets in determining Robert's financial ability to contribute to her spousal support. Consequently, the validity of the Agreement will not sever any legitimate challenges to the interpretation of its individual provisions.[4]

---

[4] This Court offers no opinion on the appropriateness, wisdom, merits, or ultimate success of any future challenge that either party may mount in this regard.

## CONCLUSION

Accordingly, this Court concludes that the Agreement discussed herein constitutes a valid contract under Arizona law, and that it's provisions shall be given effect in the Virgin Islands. The Agreement is dispositive with respect to the following issues: (1) the identification of the parties' separate premarital assets, (2) the portion of their respective incomes and earnings that constituted community property, (3) the expenses that would be paid from the community-income pool and the characterization as gifts of any payments made by either party for expenses that exceeded the assets of the community-income pool, (4) the waiver by both parties of any interest in the other party's education, (5) marital (but not post-marital) support of existing minor children, (6) the process by which community property was to be accumulated, (7) the waiver of compensation for any expenses relating to the parties' separate property, (8) the maintenance of insurance coverage for Robert, and (9) the waiver of any non-statutory community property rights.

The Court cautions, however, that the Agreement is a valid disposition of the parties' rights and obligations only to the extent that they are enumerated in the Agreement. At this remove, issues of spousal and family support, the disposition of post-marital community property, and the existence and disposition of commingled funds are explicitly excluded from the purview of the Agreement. Finally, this Court will examine on a case-by-case basis the applicability of the Agreement with respect to any other issue that may arise and has not yet been addressed. An appropriate Order shall issue.